[Crim. No. 8335. Second Dist., Div. Three. Nov. 22, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. JULIUS BERNHARDT et al., Defendants and Appellants.

Harold J. Ackerman for Defendants and Appellants.

George W. Kell as Amicus Curiae on behalf of Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—By indictment the defendants Julius Bernhardt, Vivienne Dunham and William E. Lund were accused of two crimes. In count I it was charged that they had committed the crime of conspiracy to violate section 2141 of the Business and Professions Code. In count II they were alleged to have committed the crime of manslaughter (Pen. Code, § 192) on or about February 16, 1961; the person alleged to have been killed was Ladean Stojakovich.

The defendants were doctors of chiropractic. Mrs. Stojakovich died shortly after she gave birth to a child. The defendants were present at the delivery. In a trial by jury, each defendant was found guilty of the crimes charged. █ Each has appealed from the judgment[1] and from the order

[1] In each notice of appeal it is stated that the defendant ''appeals from the judgments of conviction rendered ... on January 29, 1962.'' While the verdicts were returned on that date, the date of the judg-

denying his or her motion for a new trial. Since there is no appeal from such an order, the appeals from each order must be dismissed. (Pen. Code, § 1237; *People* v. *Eppers,* 205 Cal. App.2d 727, 728 [23 Cal.Rptr. 222].)

A proper consideration of the contentions of the defendants that prejudicial error occurred with respect to the instructions given to the jury as to the applicable law requires a statement of a large portion of the evidence.

Edward M. Carr was called as a witness by the People. He was district sales manager for the concern which manufactured Trilene and distributed the Duke inhaler. He was also a pharmacist. Trilene is a drug. His company did not sell that drug to chiropractors.

Michael Stojakovich, the husband of Ladean Stojakovich, testified that he met the defendant Lund at church about a year before his wife died. Lund was then a student at the Los Angeles College of Chiropratic in Glendale. Thereafter Lund gave chiropractic treatments to each of them. A month or two after his wife became pregnant, that fact was made known to Lund. During a visit to the Lund home, in Lund's presence Mrs. Lund discussed the matter of "home delivery" with Mr. and Mrs. Stojakovich. Thereafter Lund told them that Dr. Bernhardt specialized in home deliveries and "recommended him quite highly" with respect to the kind of delivery described as "natural childbirth." In the first or second month of her pregnancy, Mrs. Stojakovich went to Dr. Bernhardt at the clinic. In October 1960, Mr. Stojakovich observed the defendant Dunham at Dr. Bernhardt's office.

At approximately 1 o'clock on the morning of February 16, 1961, Mr. Stojakovich arrived home from work. His wife complained of pains and at approximately 1:30 a.m. she called Dr. Bernhardt on the telephone. Mr. Stojakovich also testified that "we called Dr. Lund." Dr. Bernhardt, Dr. Dunham, Dr. Lovecchio and Dr. Allison came to the Stojako-

ments (orders granting probation) in the cases of the defendants Dunham and Lund was February 28, 1962, and the date of the judgment as to the defendant Bernhardt was March 1, 1962. The notice of appeal of the defendant Bernhardt was filed on March 1, 1961, and those of the other defendants on March 7, 1961. It is clear that each defendant intended to appeal from what is designated as a judgment under section 1237 of the Penal Code. Pursuant to the governing law that "a notice of appeal will be liberally construed to permit a hearing on the merits and avoid a dismissal because of some technical defect or irregularity" (*People* v. *Robinson,* 43 Cal.2d 143, 145 [271 P.2d 872]), we deem the notices to be sufficient for the intended purpose.

vich home. Dr. Bernhardt examined Mrs. Stojakovich. A "folding cot type of arrangement" was placed on the kitchen table. Mr. Stojakovich saw "metal instruments" and, later, a hypodermic syringe. While Mrs. Stojakovich was in the "arrangement" on the table, the defendants Bernhardt, Dunham and Lund "were all around the area where she was." When the baby was born about 9 or 9:30 o'clock in the morning, Mr. Stojakovich was given a pair of scissors and Dr. Bernhardt said, "We are going to let you separate the baby from its mother." Mr. Stojakovich cut the cord.

Dr. Bernhardt told Mr. Stojakovich he had had to cut his wife because it had been a very hard delivery. Dr. Dunham handed Dr. Bernhardt "small curved-type things" and Dr. Bernhardt then did the stitching; Mrs. Stojakovich cried out with pain. Mr. Stojakovich saw Dr. Lund administering some type of an inhalator to his wife. It was very similar to the Duke inhaler which had been marked for identification while Mr. Carr was on the witness stand. One of the doctors, whom he could not identify, explained to Mr. Stojakovich that it was Trilene. Someone told him to administer the inhaler to his wife "when the pain got too much." About an hour after the delivery Dr. Lund left.

Mrs. Stojakovich's hands "began to get cold and blue and her breathing began to get hard" about 45 minutes or an hour after the delivery. Her hands and feet were rubbed. Either Dr. Bernhardt or Dr. Dunham asked Mr. Stojakovich to get her sugar and water to drink. He brought her some fruit cocktail juice. The stitching was continued. Someone said that oxygen was needed, but Mr. Stojakovich did not know by whom the remark was made. There was a comment by some person about an overdose of Trilene gas. A telephone call for oxygen was made.

Mr. Stojakovich saw a "needle and syringe" in Dr. Bernhardt's hand. The syringe contained some substance. Dr. Bernhardt twice moved the needle in the direction of the "lower regions" of Mrs. Stojakovich's body, but Mr. Stojakovich did not see Dr. Bernhardt break the skin with the needle. There was a cry of pain from Mrs. Stojakovich each time. Dr. Bernhardt said that the purpose was just to stop the bleeding.

Two men from the fire department arrived after the telephone call was made. Oxygen was given to Mrs. Stojakovich. Dr. Bernhardt and Dr. Dunham were present. Mr. Stojakovich believed that Dr. Lund had departed. A telephone call

was made by one of the firemen. An ambulance arrived. Shortly thereafter, at approximately 1:30 or 1:45 o'clock in the afternoon, Mrs. Stojakovich died.

Mr. Stojakovich asked Dr. Bernhardt about two small indentations on the baby's head. Dr. Bernhardt replied that they would go away in a short time. Subsequently, Mr. Stojakovich took the baby to Dr. Bernhardt's office. He discussed the matter of circumcision with Dr. Bernhardt, and Dr. Dunham prepared the baby. Dr. Bernhardt used some sort of an apparatus and thereafter he "took a scalpel and cut the foreskin off."

George C. Doyle, a fireman for the City of Los Angeles, testified that he was assigned to a rescue company. On February 16, 1961, he received a call at 12:13 p.m. to go to the Stojakovich home. He arrived there about five minutes later. He observed a bundle of bloody sheets. Dr. Bernhardt, Dr. Lund and Dr. Dunham were present. Dr. Bernhardt identified himself as the doctor in charge and asked Mr. Doyle to administer oxygen. Dr. Bernhardt said that it was a difficult childbirth and that he had had to use instruments. Mr. Doyle administered oxygen to Mrs. Stojakovich. She was in shock and in pain. He continued to administer oxygen to her until she passed away. The ambulance attendant was there at the time of the death, having been called by Mr. Doyle about 30 minutes after he had arrived at the home. He observed blood around the private area of Mrs. Stojakovich, and Dr. Bernhardt stated that he had applied packs to the patient.

The call to the hospital was made by Mr. Doyle at Dr. Bernhardt's direction. When Mr. Doyle asked Dr. Bernhardt to which hospital he wanted the patient sent, Dr. Bernhardt said that she had no funds and asked Mr. Doyle to have her admitted to the County Hospital. Mr. Doyle called that hospital and repeated the call five or ten minutes later. He was told that there was difficulty in getting a nurse, a nurse being necessary because a child was involved. Mr. Doyle then called the receiving hospital and an ambulance with two attendants arrived.

When Mr. Doyle, shortly after his arrival, asked Dr. Bernhardt if he was a medical doctor or an osteopath, Dr. Bernhardt made no response. Sometime later he gave Mr. Doyle his card when Mr. Doyle requested it. About the time of the arrival of the receiving hospital ambulance, in response to a question from one of the attendants Dr. Bernhardt identified himself as a chiropractor. The ambulance arrived about "35,

40 minutes ... maybe longer'' after Mr. Doyle reached the residence. The death occurred about 1:40 p.m.

Howard W. Smith testified that he was an ambulance attendant for the City of Los Angeles. He received a call to go to the Stojakovich home at 1:24 o'clock on the afternoon of February 16, 1961, and arrived there five minutes later. He described what he saw in the following words: ''... there is a table in this dinette and on the table, I would say, a piece of lawn furniture, maybe, aluminum furniture on the table and on this lawn furniture was the patient.'' Dr. Bernhardt said that he wanted the patient taken to the General Hospital, but Mr. Smith said that he would take her directly to the Hollywood Receiving Hospital. She was in extreme shock. She died before she could be removed from the premises. Mr. Smith did not think that he saw Dr. Lund there. Dr. Bernhardt said that the baby had been born at 10:27 o'clock that morning.

W. Kenneth Glidewell testified that he was an embalmer at a mortuary and embalmed the body of Mrs. Stojakovich on the day of her death. He found ''quite a bit of packing and padding around the vaginal area.'' He removed about five or six pads which were on the outside of the body and which had some blood on them. With the aid of forceps, from inside of the body he removed gauze which was saturated with blood. He observed that there had been some suturing just inside of the vaginal area.

Virginia Joyce Ryckman testified that she was the receptionist at the Glendale Chiropractic Clinic and the custodian of its records. Dr. Bernhardt was an employee of the clinic, but Dr. Lund and Dr. Dunham were not. Dr. Dunham was Dr. Bernhardt's assistant.

Dr. Serge Michael Moore, a physician and pathologist and a deputy medical examiner in the Coroner's office of the County of Los Angeles, testified that he performed an autopsy on the body of Mrs. Stojakovich on April 13, 1961, after the body had been exhumed. He expressed the opinion that ''the cause of death was shock due to postpartum hemorrhage, due to multiple lacerations of the vagina.'' He further stated that as a result of examinations made ''we were able to determine that the final cause or the final event in her death was a blood loss from hemorrhage that took place after delivering a child.'' In the course of the examination, the possibility that some other condition contributed to her death was considered and eliminated.

Dr. Moore further testified as follows: "The examination of the external genitalia ... revealed that there were two areas of tear in the vaginal wall. On the right, that is to the right of the midline next to the right thigh there was a tear that measured one and a half inches in length and the borders of this tear had been reproximated, had been brought together in apposition to one another by three interrupted sutures. ... [O]n the side of the left thigh, there were two other sutures that were identified. There were several irregular superficial tears in the interior part of the vagina and in the posterior part of the vagina. These were covered by blood clots and others show [sic] fragments of suture material, that is, material that is used for stitching wounds. On closer examination of the vaginal wall a total of 15 stitches were counted." In examining the cavity of the vagina he found and removed two blood-soaked gauze strips, each measuring 27 inches in length and 8 inches in width.

In the course of his examination, Dr. Moore found two large tears of the vaginal wall. The tear on the left side measured 4 inches in length and approximately 2 inches at its greatest width. On the right side the tear was 2 inches in length and 1 inch in width.

Dr. Moore testified that there was some stitching in "the deeper tears in the vaginal wall." The sutures were on both sides. He counted 15 stitches "in the external lacerations and the internal or the deeper lacerations." In his opinion, the tears in the vaginal vault existed before the death and the injuries were sustained in a period of time which was between three and six hours before the death.

Dr. Moore testified that his examination revealed no pulmonary embolism; in his opinion, death was not caused by pulmonary embolism. He found no other type of embolism. His opinion was that death was not the result of pulmonary edema. Dr. Moore further stated in part: "... the lacerations up here in the vagina were large enough and the openings were wide enough to have caused sufficient bleeding to have the person go into shock."

Dr. Arthur K. Salberg, who was licensed to practice medicine in California, testified that he took X-ray views of the body on April 13, 1961. In his opinion, the pelvis was of a size adequate for the delivery of a baby of the usual size.

John F. Bester, associate professor in the School of Pharmacy at the University of Southern California, testified that Trilene is an analgesic and anesthetic. It is administered by

inhalation, a mask being used. The chemical compound of Trilene is included in the United States Pharmacopoeia under the name Trichloroethylene, which is a drug. Trilene is a trade name for that chemical.

Dr. Theodore Curphey, the Coroner of the County of Los Angeles and the Chief Medical Examiner, testified that he was a certified pathologist. He was present from time to time during the course of the autopsy. He expressed an opinion as follows: ''Cause of death: Shock due to post partum hemorrhage, due to multiple lacerations of the vagina.''

Sidney W. Wilson, an investigator for the Department of Professional and Vocational Standards of the State of California, testified that there was no record that any of the defendants had been licensed by the State of California to practice medicine or osteopathy. Evidence was received showing that the defendants were respectively licensed by the Board of Chiropractic Examiners as follows: Dr. Bernhardt, February 16, 1947; Dr. Dunham, February 27, 1960; Dr. Lund, August 27, 1960.

Dr. James Vincent McNulty, a medical doctor licensed by the State of California, testified that he specialized in the field of obstetrics and gynecology. In response to a hypothetical question based on testimony theretofore produced by the prosecution, and particularly the testimony of Dr. Moore, Dr. McNulty expressed the opinion that the person described ''sustained a post partum hemorrhage after the delivery of this child.'' With respect to the condition evidenced by the two tears described as being in the lateral walls of the vagina, the witness stated: ''I would say following a delivery or a traumatic delivery that you would see it in one in three hundred deliveries or one in five hundred deliveries.'' He further said that ''[i]t is commonly seen with a traumatic delivery or a difficult delivery.'' It was not something that would be anticipated ''in a normal easy spontaneous delivery.'' By a traumatic delivery he meant a ''delivery that was accomplished with the difficult use or improper use of forceps.''

Dr. McNulty was asked whether, assuming the baby to have been in a particular position, with the umbilical cord wrapped around its neck, a delivery of such a nature would cause the tears of the vaginal tract to which reference had been made. He expressed the opinion that it would not, his reasons being stated as follows: ''I have never seen a delivery, a spontaneous delivery or an easy delivery, associated

with vaginal tears of this extent and this magnitude, other than with the use of instruments.'' In his opinion, the two larger tears described to him were caused by ''the use of force of great magnitude.'' Dr. McNulty further stated: ''I feel that these lacerations were sustained as a result of the difficult delivery, using probably forceps, as far as I can tell, because I have never seen injuries of this magnitude without the use of forceps.'' In his opinion, packing would only increase the extent of the lacerations and probably increase the hemorrhage. Dr. McNulty further testified that, for the purpose of maintaining the blood pressure, the giving of intravenous fluids should be started as soon as the diagnosis is made that the patient has sustained a laceration and is suffering from an early post partum hemorrhage. Suturing of a laceration should be started as soon as it is discovered. In the witness' opinion, assuming that everything was properly done, the patient described in the hypothetical question should not have died.

Donald K. Gray testified that on March 28, 1961, he was a police officer for the City of Los Angeles. He related a statement made to him by Dr. Bernhardt on that date, part thereof being as follows: ''That when he arrived at the residence he had a portable delivery table and a complete bag of OB instruments, an OB kit he called it, and he stated that this bag was the same complete kit that would be found in any hospital. ... They waited until approximately 9:30 to 10:00 o'clock in the morning and then decided that the patient was ready to deliver. Then they prepared the patient for delivery. At this time the patient was having trouble, and that he made an episiotomy on the patient. I asked him to explain the episiotomy, and he explained that it was an incision made in the vaginal opening to expedite the delivery. After this incision was made he observed the baby's head and noticed that the umbilical cord was wrapped twice around the baby's neck and one arm was in an unnatural position. He clamped off the umbilical cord, straightened the arm, and delivered the baby. After the delivery he packed the vaginal vault with gauze and proceeded to repair the incision with sutures. That he had made 15 to 20 sutures but at this time he noticed the patient was going into a state of shock. That he did not complete his repair on the incision with the sutures. He covered the patient with blankets. Then he called the Fire Department for the rescue squad. ... I asked him if there was any excessive bleeding, and he stated no, that there was no

excessive bleeding, that only the normal amount of blood was lost during this birth. ... He stated that he diagnosed the victim's death due to embolism.'' In reply to the officer's inquiry as to the contents of the ''OB kit,'' Dr. Bernhardt said that it consisted of sterile sheets, sterile bandages, a Trilene mask, suturing materials, scalpels, and scissors.

On March 30, 1961, Lieutenant Gray had a conversation with Dr. Dunham in Dr. Bernhardt's office. She stated that she had no private practice of her own and that she acted as Dr. Bernhardt's assistant and had assisted him in many deliveries. She further said that in the early morning hours of February 16, Dr. Bernhardt telephoned her and asked her to come to the Stojakovich residence and assist Mrs. Stojakovich in the delivery of the child. She had had no prior contact with the patient. When she arrived, Dr. Bernhardt, Dr. Lund, Dr. Allison and Dr. Lovecchio were present. She further stated that she devoted all of her time to the patient and did not know what the doctor was doing in the actual delivery. She did not see any incision made. When the baby was born, it was given to her to clean. She took the child into the kitchen and later returned to the room where the mother was. She gave the patient fruit cocktail juice. About this time she noticed that the patient was going into a state of shock and she called this condition to Dr. Bernhardt's attention. He asked her and the other persons to call for the fire department rescue squad but, because of their excitement, Dr. Bernhardt made the call himself. She received no fee for her assistance but was merely seeking to gain experience. She said that, to her knowledge, there were no scalpels, suturing materials or hypodermic syringes present. She was unaware of any suturing or episiotomy.

On March 30, Lieutenant Gray talked with Dr. Lund at his office in Long Beach. Dr. Lund stated that he had suggested to Mrs. Stojakovich that she go to the Glendale Chiropractic Clinic for prenatal care and delivery. During the nighttime on February 16 he received a telephone call from Mrs. Stojakovich. She said that she was ready to deliver and requested him to come to her home. When he arrived there, the other doctors were present. He said that he was not there as a doctor but as a friend. Part of his statement was: ''I went there to offer encouragement and to hold her hand during this ordeal.'' During the time of the delivery all of his attention was directed to the matter of assisting Mrs. Stojakovich in her breathing. He did not know what occurred with

respect to the delivery itself. The birth occurred shortly before 10:30 o'clock in the morning. He stated that a Trilene mask was used but that Mrs. Stojakovich used the inhalator and mask herself. He did not know who furnished the inhalator, but he presumed that Dr. Bernhardt did. About 11 a.m. Dr. Lund left the home to return to his office in Long Beach because he had an appointment at noon. It was a day or two later when he heard of the death.

Dr. John G. Anderson, a licensed doctor of chiropractic, was called as a witness on behalf of the defendants. He was a member of the faculty of the Los Angeles College of Chiropractic, located in Glendale, and dean of its graduate school. He knew the defendants. Dr. Bernhardt was a graduate of the postgraduate school of that institution "in obstetrics and gynecology." Since about 1957 Dr. Bernhardt had been a professor of obstetrics and gynecology at that college. Under the rules of the Chiropractic Board, a total of 180 hours of study in gynecology and obstetrics was required of a person seeking to be licensed as a chiropractor. The school required that students have "practical experience in obstetrics" and observe deliveries. It was a requirement of the State Board of Chiropractic Examiners for admission to examination that the candidate must have observed a delivery. This prerequisite had, to the witness' knowledge, existed since about 1957. On the license application form, the candidate was asked whether he had had any practical work in obstetrics, whether he had delivered a baby and, if so, how many, and whether he had observed a delivery or deliveries. To the witness' knowledge, such inquiries had been made in the application form since 1958. At the school, part of the course in obstetrics and gynecology embraced prenatal and postnatal care and the technique of deliverying babies, a technique not requiring the use of drugs or cutting or surgical procedures.

With respect to cases referred to the clinic which the attending chiropractor believes might involve a complicated delivery, Dr. Anderson testified that "[t]hey are referred to a hospital or obstetrician in another field," a doctor of medicine or a doctor of osteopathy. With respect to emergencies, "[s]uturing with lacerations, control of hemorrhage by that method, and by packing" are taught. All of the deliveries made through the clinic are home deliveries.

On cross-examination, Dr. Anderson testified that a chiropractor, as taught by his school, could not give a hypodermic injection. In his opinion, a chiropractor should not use the

drug Trilene; his conclusion would be that its use would be the practice of medicine. Minor surgery was a subject required by the board, and it was being taught at the college.

Dr. Anthony Lovecchio testified that he was licensed as a chiropractor in California in 1959. He was present at the Stojakovich home on February 16, 1961. He had asked Dr. Dunham if he could observe a home delivery. He took no part in the treatment of the patient. He saw no one administer the inhalator; Mrs. Stojakovich used it herself two or three times. He observed no hypodermic needles, but he did see suturing material in the possession of Dr. Bernhardt. He saw thread and a curved suturing needle.

Dr. Lund, one of the defendants, testified on his own behalf. He was licensed as a chiropractor in 1960. He resided in Garden Grove and had his office in Long Beach. He met Mrs. Stojakovich in the latter part of 1958 or the first part of 1959 when she attended the church in Glendale of which he was a member. She was in the adult Sunday School class which he taught. Six or seven months later he met Mr. Stojakovich. Lund was then a student at the Los Angeles College of Chiropractic. Mrs. Stojakovich told him she was extremely nervous. He suggested that she go to the clinic, which she did. He attended her as an extern in December of 1959. On July 17, 1960, at his home Mr. and Mrs. Stojakovich talked to him with respect to their marital difficulties. Mrs. Stojakovich revealed that she was pregnant, and the defendant Lund and his wife discussed with her the subject of home deliveries. Shortly thereafter, Mr. and Mrs. Stojakovich went to the clinic, but Lund took no part in her prenatal treatment. He did have further discussions with them with respect to their domestic difficulties, for which he received no fee. He last saw them at the clinic in August of 1960. Thereafter, on several occasions when Mr. Stojakovich came for treatment to the office which Dr. Lund had opened in Long Beach, Mrs. Stojakovich accompanied him. There was further discussion of their domestic problems. The last treatment of Mr. Stojakovich was in October 1960. Dr. Lund did not see them again until the day of the delivery in February, but Mrs. Stojakovich called him on the telephone twice about the impending delivery. In the early morning on February 16, 1961, she telephoned him and said she had started labor and requested that he come to her home. He went from his home in Garden Grove to her residence. It was raining and the trip took about an hour and 20 minutes. Lund was not engaged in the practice of obstetrics.

When the delivery was near, a lap drape was put over Mrs. Stojakovich. While the patient was on the delivery table prior to the birth of the child, Dr. Lund "was holding the patient's right hand mainly and talking to her." A mask was strapped to her right wrist but he did not apply the mask to the patient at any time. The patient herself held it up to her face on one or two occasions. He did not know whether the article had any chemical substance in it. He remembered something being said about its being used as a placebo.

When the baby was born, Mr. Stojakovich severed the umbilical cord. Dr. Lund then watched Dr. Dunham as she took care of the baby. He left at 10 minutes to 11 o'clock to keep an appointment at noon in Long Beach. He was not there when the rescue squad of the fire department was called or when it arrived. When he left the home, there was nothing unusual about the physical condition of the patient that he "was able to determine." She was talking to her husband about the baby. He could not see what Dr. Bernhardt was doing at the time of the delivery. He had his back to the area of delivery and was facing Mrs. Stojakovich's head, holding her right hand in his right hand. He saw the baby "held up after delivery."

Dr. Lund testified that either that day or the next he went to Arizona with his father. The purpose was to inspect a mine. He returned home early the following Sunday morning. He then learned of Mrs. Stojakovich's death.

Dr. Dunham testified as a witness in her own behalf. She was licensed as a doctor of chiropractic on February 27, 1960. She saw Mrs. Stojakovich for the first time when she went to her home on February 16, 1961. She was called to assist Dr. Bernhardt. In deliveries, her duties were to take care of the baby. She was present to learn, and she was to receive no remuneration. Dr. Lund did nothing except observe. A sterile sheet was draped over the patient. After the baby was born she took him into the kitchen. She recalled no marks of any kind on him. She saw no obstetrical forceps. An hour to an hour and a half elapsed after the birth before Mrs. Stojakovich became distressed or complained of difficulties. She saw no evidence of any excessive bleeding on the part of the patient at any time.

Dr. Dunham believed that she saw sutures on the table. She did not see Dr. Bernhardt make any incision in the pa-

tient for the purpose of suturing. She did not see him perform an episiotomy. With respect to the inhalator, Dr. Dunham testified in part as follows: "Dr. Bernhardt suggested that she put it over her face. ... He said something about [the use of] it, if the contractions seemed too severe, or something on this order, just try putting the mask over your face." She saw no one administer the mask to the patient except the patient herself.

Dr. Bernhardt testified as a witness in his own behalf. He had been engaged in the practice of making home deliveries for the last five years. That had been in connection with demonstrating to his students the methods of chiropractic or natural birth. If he believed that there would be complications in connection with a delivery, the patient was "referred to either an osteopathic physician and surgeon or a medical obstetrician" for hospital delivery. No surgery was contemplated under the chiropractic theory of natural childbirth; suturing would be done only if there was a tear which had to be repaired. Dr. Bernhardt had had discussions with members of the Board of Chiropractic Examiners about this technique and was not advised that it was wrong or that he should not engage in obstetrical practice.

Dr. Bernhardt further testified that in his prenatal examination of Mrs. Stojakovich he found no indication that she would not deliver normally. The measurements of the pelvis were normal. About 1 o'clock on the morning of February 16, 1961, Mrs. Stojakovich called him and stated that she was having contractions which were about 10 minutes apart. After discussing with her the nature of the contractions, he formed the belief that she was in early labor. He went to her residence, arriving there about 1:30 or 2 a.m. About 9:30 o'clock in the morning she was placed on the table. He had with him two scissors, one being "a bandage scissors and one ... a plain ordinary nonblunted scissors, or just a plain scissors." In addition, he had two or three cord clamps, four towel clips for the drape, suture material with attached needles, and a needle holder. He also had with him a Trilene mask or Duke inhalator, but no fluid or material for use in the mask. There was no material in the inhalator. Dr. Bernhardt made use of it "as part of the suggestive approach in connection with natural childbirth." He described it as "a type of placebo or a distraction." He did not bring any obstetrical forceps.

Dr. Bernhardt further testified that on February 16, 1961, Dr. Lund had no part in the treatment of the patient. He

had not participated in the prenatal care. He was to receive no fee. Dr. Dunham acted as his nurse and her major responsibility in a home delivery was to care for the baby. She was not employed by the clinic. She received no fee.

Dr. Bernhardt described the course of the delivery. He testified that it was "a brow presentation," an unusual presentation which occurred "perhaps one in a thousand deliveries." He had done about 1,500 home deliveries in the preceding 15 years, but this was the first time he had had that type of a presentation. He had never lost a patient before. He had no way of anticipating that the presentation or delivery would be as it was.

After the birth Dr. Bernhardt noticed "two lacerations of the perineum." He put pads on them. In 15 to 20 minutes after the birth the placenta was delivered. During the period described the patient was draped with a sheet over her legs and what Dr. Bernhardt was doing could not be seen by the other persons present. There was no unusual bleeding from the vaginal orifice after the placenta emerged.

With respect to the matter of sutures, Dr. Bernhardt testified in part as follows: "Q. Did you anticipate any tears that were in there at any time? A. No, sir. Q. Did you feel that the repair of those tears was a type of emergency procedure, Doctor? A. That's right. They were there and I just had to repair them. ... Q. Now, after your sutures were completed did the two tears there cease to bleed? A. That's right. Q. Now, after you had completed that work did you notice any other tears? A. No, sir." He did not see any tears such as the two tears which had been described as being respectively 2 and 4 inches in length. As he completed his repair, Mrs. Stojakovich showed signs of shock. This was at approximately noon. He called the fire department and asked for the rescue squad.

Dr. Bernhardt testified that in the preceding five years he had signed birth certificates in all cases in which he had made home deliveries in connection with his work at the Los Angeles College of Chiropractic. Prior to this case, his attention had never been invited to any problem "in connection with doing home deliveries or obstetrics."

Dr. Bernhardt denied that he told Mr. Doyle of the fire department rescue squad that it was a difficult delivery and he had had to use instruments. He used no instruments in the delivery of the child. He did not make an episiotomy and he did not tell Officers Gray and Hanson that he had done so.

He did tell Lieutenant Gray that there were tears in the area where episiotomies are often found and that he had sutured the patient. He did not tell the officers that his kit contained scalpels. No hypodermic needles or syringes were used by him on the body of Mrs. Stojakovich. He did not pack the vagina for the purpose of stopping any bleeding.

Dr. Bernhardt signed the death certificate on February 17, 1961. Therein the cause of death was stated to be "Embolism," due to "Dystocia." Part of his testimony was as follows: "Q. And was that cause of death, embolism due to dystocia, your professional opinion and conclusion based on your treatment and observation of the patient, Ladean Stojakovich? A. Yes, it was." At a later point in his testimony, he stated that "[d]ystocia is abnormal labor or difficult hard labor." He could not say what kind of embolism was involved.

Donald K. Gray was recalled as a witness on behalf of the People in rebuttal. In the conversation which he had with Dr. Bernhardt on March 28, Dr. Bernhardt stated that his pack contained a Trilene mask, sheets, gowns, scalpels and suturing materials. He further stated that Mrs. Stojakovich was having trouble delivering the baby and he performed an episiotomy which, he explained, was an incision into the vaginal opening to enlarge it so as to permit the delivery of the child. Dr. Bernhardt said that the incision was an inch to an inch and one-half in length.

The witness Gray testified that on March 30, 1961, in response to a question whether there was "any anesthetic given this woman," Dr. Lund replied, "She had a Trilene mask she used herself."

Larry Keith Sanford, called as a witness on behalf of the People in rebuttal, testified that he arrived at the Stojakovich residence at about 11:20 o'clock on the morning of February 16, 1961. Dr. Dunham came to the back door when he knocked. After Mrs. Stojakovich had directed Dr. Dunham to do so, Dr. Dunham told him to wait outside. While waiting he heard Mrs. Stojakovich "cry out" on at least three occasions. He stayed outside for about an hour and a half. He later entered the home when the ambulance attendants were there. He disposed of a bucketful of bloody gauze, paper and cotton. In the bottom of the bucket there was less than a cup of blood. There was some blood spattered on the wall and on the floor in the room where Mrs. Stojakovich had been.

Harry Hansen, a police officer for the City of Los Angeles, testified in rebuttal on behalf of the People. Sergeant Hansen

talked with Dr. Bernhardt on March 28, 1961. Lieutenant Gray was present. After Dr. Bernhardt said that he had taken an "OB pack" with him in order to perform the delivery, the witness asked him what was contained in such a pack. Dr. Bernhardt replied: "Sheets, portable table, mask, gloves, gown, Trilene mask, catheter, scalpels, suturing material. In fact, everything that is standard acceptable material, according to hospital technique." Dr. Bernhardt also said, "in effect," that it was a difficult delivery, that the baby's arm was wrapped around the neck, and that it was necessary to do an episiotomy which he described as being "an incision in the vaginal orifice."

■ The defendants assert that section 2141 of the Business and Professions Code[2] is vague and uncertain as to whether a person who holds a license as a doctor of chiropractic is permitted to engage in the practice of obstetrics. But that contention is untenable. Section 2141 prohibits such practice by chiropractors in language which is not unconstitutionally vague. (*Crees* v. *California State Board of Medical Examiners*, 213 Cal.App.2d 195, at pp. 211-212, 214-215 [28 Cal.Rptr. 621]; see *Dayan* v. *State of California*, 293 F.2d 46.)

With respect to each count, the defendants assert that the jury was erroneously instructed as to the applicable law.

■ In the first count it was charged that the defendants had committed the crime of conspiracy to violate section 2141 of the Business and Professions Code. It was the position of each defendant that he or she had acted in good faith in the belief that the practice of obstetrics was lawful under a chiropractic license. The defendants were entitled to have the jury instructed with respect to the matter of the specific intent required to sustain the charge of conspiracy. ■ The governing law is stated in *People* v. *Marsh*, 58 Cal.2d 732, at page 743 [26 Cal.Rptr. 300, 376 P.2d 300], as follows: "The essence of the crime of conspiracy is the 'evil' or 'corrupt' agreement to do an unlawful act. It is the evil intent that makes a combination criminally indictable. 'The association

[2]Section 2141 of the Business and Professions Code is as follows: "Any person, who practices or attempts to practice, or who advertises or holds himself out as practicing, any system or mode of treating the sick or afflicted in this State, or who diagnoses, treats, operates for, or prescribes for any ailment, blemish, deformity, disease, disfigurement, disorder, injury, or other mental or physical condition of any person, without having at the time of so doing a valid, unrevoked certificate as provided in this chapter, is guilty of a misdemeanor."

of persons with an honest intent is not conspiracy, and one of the tests on a conspiracy trial is, did the accused act in ignorance without criminal intent? In other words, did they honestly entertain a belief that they were not committing an unlawful act?' (*People* v. *Bucchierre,* 57 Cal.App.2d 153, 163 [134 P.2d 505].) As stated by the New York Court of Appeals, 'The criminal quality [of a conspiracy] resides in the intention of the parties to the agreement, construed in connection with the purpose contemplated. The mere fact that the conspiracy has for its object the doing of an act which may be unlawful, followed by the doing of such act, does not constitute the crime of conspiracy, unless the jury find that the parties were actuated by a criminal intent.' (*People* v. *Flack,* 125 N.Y. 324 [26 N.E. 267, 269, 11 L.R.A. 807].)

''For these reasons it is often said that conspiracy is a 'specific intent' crime (Harno, *Intent in Criminal Conspiracy* (1941) 89 U.Pa.L.Rev. 624, 636; Perkins, Criminal Law (1957) p. 544). ██ This specific intent of the conspirators must be proved in each case by the prosecution and will not be presumed from the mere commission of an unlawful act (*People* v. *Bowman,* 156 Cal.App.2d 784, 797 [320 P.2d 70]; *People* v. *Maciel,* 71 Cal.App. 213 [234 P. 877]). ██ Therefore, even though a conspiracy has as its object the commission of an offense which can be committed without any specific intent, there is no criminal conspiracy absent a specific intent to violate the law. That is, to uphold a conviction for conspiracy to commit a 'public welfare offense' there must be a showing that the accused knew of the law and intended to violate it. (*Commonwealth* v. *Benesch,* 290 Mass. 125 [194 N.E. 905, 910]; *People* v. *Flack, supra,* 125 N.Y. 324 [26 N.E. 267]; *People* v. *Powell,* 63 N.Y. 88, 92; *Mitchell* v. *State,* 248 Ala. 169 [27 So.2d 36]; *Landen* v. *United States,* 299 F. 75; 72 Harv.L.Rev. 920, 936.)'' (See *People* v. *Bowman,* 156 Cal.App.2d 784, 797-799 [320 P.2d 70].)

██ In the present case the jury was instructed as follows: ''In the case of certain crimes it is necessary that in addition to the intended act which characterizes the offense, the act must be accompanied by a specific or particular intent without which such a crime may not be committed. Thus in the crime of Conspiracy to Violate Section 2141 of the Business and Professions Code as charged in Count I of the Indictment, a necessary element is the existence in the mind of the perpetrator of the specific intent to violate said section or that the defendants entered into the common purpose with

knowledge that a violation of law would result from the commission of the contemplated act or acts, and unless such intent so exists that crime is not committed.''

The defendants contend that the effect of that instruction on specific intent was prejudicially diminished because thereafter an instruction was given which was in pertinent part as follows: ''In every crime or public offense there must exist a union or joint operation of conduct and intent, or a union or joint operation of conduct and criminal negligence. Criminal intent is an intent to do something which the law forbids and designates as a crime. To come within the meaning of the term one need not intend all the consequences of his conduct, and he need not know that such conduct is unlawful. ... *However, concerning the crime of conspiracy let me caution you to keep in mind the instruction heretofore given to you on specific intent.''* (Italics added.)

In *People* v. *Booth,* 111 Cal.App.2d 106, this court said at page 108 [243 P.2d 872]: ''In every case involving specific intent an instruction on specific intent is sufficient for all purposes. It embraces all the elements of general intent. When instructions are given on both general and specific intent a third instruction is necessary which states that the instruction on general intent does not relate to crimes which require proof of specific intent.'' The italicized language of the instruction criticized by the defendants did not clearly inform the jury that that instruction was intended to apply *only* to the manslaughter charge contained in the second count. The language was misleading because the jurors could reasonably assume that both instructions related to the conspiracy charge, an assumption which could only lead to confusion and misunderstanding. (See *People* v. *Barkoff,* 163 Cal.App.2d 639, 648 [329 P.2d 1005].) Whether such error was prejudicial is a matter to be hereinafter considered.[3]

The instruction just discussed also contained the fol-

[3]The People call attention to the fact that the defendants requested the following instruction (which was not given): ''An essential element of the [each] crime of which the defendant is accused [in count ......... ...... of the information] is intent, the law requiring that to constitute such a crime there must exist a union or joint operation of criminal conduct and criminal intent. However, this does not mean that one must intend all the consequences of his conduct, or that he must know that such conduct is unlawful, to be guilty of a public offense such as that [any of those] charged against the defendant in this case. The intent to do the forbidden thing constitutes the criminal intent. The law requires that to be guilty of crime, one must intend the conduct that fits the

lowing paragraph: "The word 'negligence' imports a want of such attention to the nature or probable consequences of an act or omission in question as a prudent man ordinarily bestows in acting in his own concerns. Although the law defines 'negligence' as I have stated, we recognize that the term is not an absolute one but a relative one. By this we mean that in deciding whether or not certain conduct in question amounted to criminal negligence, the conduct must be considered in the light of all the surrounding circumstances as shown by the evidence." That this definition of criminal negligence was not a correct statement of the law with respect to the second count, in which manslaughter was charged,[4] is clear from the reasoning of the Supreme Court in *People* v. *Penny*, 44 Cal.2d 861 [285 P.2d 926], a case which involved a conviction of manslaughter.

The instruction before the court in the *Penny* case is embodied in the following portion of the opinion (44 Cal.2d at p. 869): "The second clause of section 192, subdivision 2, of the Penal Code provides that one is guilty of manslaughter if a human being is killed in the commission of a 'lawful act which might produce death, in an unlawful manner, or without due caution and circumspection. ...' It has been held that without 'due caution and circumspection' is the equivalent of 'criminal negligence' (*People* v. *Driggs*, 111 Cal.App. 42 [295 P. 51]; *People* v. *Hurley, supra,* 13 Cal. App.2d 208 [56 P.2d 978]) and the jury was so instructed.

description of the crime and must engage in that conduct knowingly and wilfully.''

The People, relying on *People* v. *Wright*, 167 Cal. 1, at pages 7-8 [138 P. 349] (see also *People* v. *Miller*, 185 Cal.App.2d 59, 81-82 [8 Cal.Rptr. 91]), argue that if there was error, the instruction requested by the defendants shows that it was invited error of which they may not complain. But the difficulty with that argument is that the proposed instruction was not in final form for use and did not state that it was applicable to the count containing the charge of conspiracy. Consequently, it cannot be said to have constituted an invitation to commit error by giving the jury inconsistent instructions with respect to the nature of the intent required to be proven to sustain that charge. Under such circumstances the doctrine of invited error cannot reasonably be applied.

[4]The definition of involuntary manslaughter given to the jury was as follows: "Manslaughter is the unlawful killing of a human being without malice. One kind of manslaughter, the definition of which is pertinent in this case, is involuntary manslaughter, being that which is done in the commission of an unlawful act not amounting to a felony, or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.''

However, the jury was also instructed that "Due caution and circumspection ... mean such caution and circumspection as are reasonably appropriate to avoid injury to one's self and others, under the conditions at hand as they would be viewed by an ordinarily reasonable person in the same situation as the person whose conduct is in question. To exercise due care and circumspection is to take those proper precautions which a person of ordinary prudence would use in the same circumstances.' Defendant contends this instruction was prejudicially erroneous in that it gave the jury the civil standard of negligence as a guide in a case where criminal negligence was involved."

In sustaining the position of the defendant Penny that error had been committed, the court stated (44 Cal.2d at pp. 879-880) : "The statute (Pen. Code, § 192, subd. 2) provides (in part) that in order to convict a person of involuntary manslaughter, there shall be an unlawful killing of a human being in the commission of a lawful act which might produce death without due caution and circumspection. The words lack of 'due caution and circumspection' have been heretofore held to be the equivalent of 'criminal negligence' (Pen. Code, § 20). The general rule is set forth in 26 American Jurisprudence, Homicide, section 210, page 299, as follows: 'The authorities are agreed, in the absence of statutory regulations denouncing certain acts as criminal, that in order to impose criminal liability for a homicide caused by negligence, there must be a higher degree of negligence than is required to establish negligent default on a mere civil issue. The negligence must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life, or, in other words, a disregard of human life or an indifference to consequences.' The article continues thus: 'Aside from the facts that a more culpable degree of negligence is required in order to establish a criminal homicide than is required in a civil action for damages and that contributory negligence is not a defense, criminal responsibility for a negligent homicide is ordinarily to be determined pursuant to the general principles of negligence, the fundamental of which is knowledge, actual or imputed, that the act of the slayer tended to endanger life. The facts must be such that the fatal consequence of the negligent act could reasonably have been foreseen. It must appear that

the death was not the result of misadventure, but the natural and probable result of a reckless or culpably negligent act.'

"We hold, therefore, that the general rule just quoted, sets forth the standard to be used in California for negligent homicide (Pen. Code, § 192, subd. 2) in other than vehicle cases. Defendant here was charged with a violation of section 192, subdivision 2, of the Penal Code. The jury should have been instructed according to the rule which generally prevails in this country as to what constitutes criminal negligence, or lack of due caution and circumspection so that her guilt or innocence might be determined in accord therewith." (See 8 Stan.L.Rev. 463; 3 U.C.L.A. L.Rev. 254.)

The concept conveyed by the instruction given in the present case was that nothing more than ordinary negligence constituted criminal negligence sufficient to sustain a conviction under the charge of involuntary manslaughter. That erroneous concept was not eradicated by the further instruction in which the jury was told: "The term 'without due caution and circumspection' as used in these instructions means such a departure from what would be the conduct of an ordinarily prudent or careful man under the same circumstances as to be incompatible with a proper regard for human life or, in other words, a disregard for human life or an indifference to consequences. The facts must be such that the fatal consequences of the careless or negligent act could reasonably have been foreseen and it must appear that the death was not the result of misadventure but the natural and probable result of a reckless or culpably negligent act." It cannot be said that that instruction was sufficient to overcome the effect of the preceding seriously erroneous instruction.

With respect to the manslaughter charge it is also contended that there was prejudicial error in that the jury was not instructed on the subject of proximate causation. No reference was made to that subject except insofar as it was mentioned in the instruction defining the term "without due caution and circumspection," set forth hereinabove. The evidence of the prosecution was that the death was caused by shock "due to post partum hemorrhage, due to multiple lacerations of the vagina." It was the opinion of Dr. Bernhardt that the cause of death was an embolism for which no act of any defendant was responsible. The matter of proximate cause was an issue which had to be resolved by the jury.

As stated by Perkins, in discussing the subject of the causal relation between unlawful act and death: "For con-

viction of manslaughter in such a case the state must do more than establish mere coincidence between such an act and the fact of death. It must establish the 'causal connection' between the violation and the loss of life.'' (Perkins, Criminal Law (1957) p. 59.) Moreover, the same burden exists where the charge of manslaughter rests on evidence of criminal negligence. (*People* v. *Rodriguez,* 186 Cal.App.2d 433, 440 [8 Cal.Rptr. 863].) ▉ A failure to instruct upon the element of proximate causation where that matter is in issue constitutes error. (*People* v. *Kerrick,* 86 Cal.App. 542, 548 [261 P. 756].)

▉ It is true that the defendants offered no appropriate instruction on the subject of proximate causation. But that the trial court should have given such an instruction on its own motion is clear in the light of the governing law. ▉ ''In determining what instructions a trial court is required to give without request, the rule is usually stated to be that the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested. ... The most rational interpretation of the phrase 'general principles of law governing the case' would seem to be as those principles of law commonly or closely and openly connected with the facts of the case before the court.'' (*People* v. *Wade,* 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].) ▉ In an involuntary manslaughter case of the nature of that presently before this court, such duty encompasses the giving of an instruction defining an element of the offense which the jury must find to exist before a conviction is justified. Such an instruction was necessary in the present case because it was vital to a proper consideration of the evidence by the jury. (See *People* v. *Holt,* 25 Cal.2d 59, 64-65 [153 P.2d 21].)

▉ There remains for determination the question whether the defects in the instructions constituted prejudicial error. The charge of conspiracy to violate section 2141 of the Business and Professions Code will first be considered. The evidence of the prosecution supported the inference that while Dr. Lund had discussed ''natural childbirth'' with Mrs. Stojakovich and had recommended that she place herself under the care of Dr. Bernhardt with respect to her pregnancy, Dr. Lund rendered no prenatal care to her and was present at the time of the delivery only because Mrs. Stojakovich had requested him, as a friend, to be with her at

that time. He denied that he had administered the Trilene inhalator to Mrs. Stojakovich or that he saw Dr. Bernhardt employ instruments or surgery. Dr. Dunham testified that she did not see the use of any instruments or the doing of any suturing by Dr. Bernhardt. There was evidence that obstetrics was the subject of a course which both Dr. Lund and Dr. Dunham had been required to take in their chiropractic schooling and that a prerequisite to the granting of a license as a chiropractor was the observation of, or participation in, a delivery. A consideration of the record shows that there was substantial evidence in support of an inference that both Dr. Lund and Dr. Dunham believed in good faith that a delivery pursuant to the chiropractic theory of natural childbirth, without the use of drugs, instruments or surgery, could be done by a chiropractor without violating section 2141 of the Business and Professions Code.

As has been noted, in the absence of a specific intent on the part of a defendant to violate section 2141 of the Business and Professions Code, there could not properly be a conviction of that defendant of the crime of conspiracy charged. (See *People* v. *Marsh, supra,* 58 Cal.2d 732, 743.) In such a case, a mistake of law may preclude the existence of the requisite intent. (See *People* v. *Smith,* 204 Cal.App.2d 797, 802 [23 Cal.Rptr. 5] ; 1 Witkin, Cal. Crimes, § 149, p. 143.) It is thus evident that as to Dr. Lund, the determination of his guilt or innocence of the crime of conspiracy rested to a major extent upon the resolution of the question whether he intended to violate the law as embodied in section 2141 in his undertaking with respect to Mrs. Stojakovich. The same is true with respect to Dr. Dunham. The specific intent of each of those defendants was a principal issue as to which the evidence was in substantial conflict. It was stated in *People* v. *Barkoff, supra,* 163 Cal.App.2d 639, at page 648: "The authorities support the proposition that where the lawfulness of the act depends upon a specific intent, to instruct upon general as well as specific intent normally would confuse the jury and is error."

The present case is not of the character of those such as *People* v. *Booth, supra,* 111 Cal.App.2d 106, wherein this court held that a similar conflict in instructions was not prejudicial because there were no facts in evidence which even remotely suggested that the acts could have been committed innocently. (See 111 Cal.App.2d at p. 109.) The reasoning which is apropos in the present case is that found in *People*

v. *Simms,* 144 Cal.App.2d 189, wherein Mr. Justice Dooling stated at page 195 [300 P.2d 898]: "The court in *People* v. *Geibel,* 93 Cal.App.2d 147, 177 [208 P.2d 743], held the giving of this same instruction prejudicially erroneous in a forgery case, which also requires the specific intent to defraud, in spite of the fact that the court also gave a correct instruction to the latter effect. The court said of the two instructions: 'At most it created a conflict and normally would serve only to confuse or mislead the jurors and make it impossible to determine whether, in their deliberations, they followed the law as correctly or incorrectly given to them.'

"In this connection the court instructed the jury: 'Do not single out any certain sentence or any individual point or instruction and ignore the others, but consider all the instructions as a whole, and regard each in the light of all the others.'[5]

"Who can say how the jurors, considering the conflicting instructions 'as a whole and regarding each in the light of the others,' as they were instructed to do, may have resolved the conflict in these instructions? As the Supreme Court said in *People* v. *Kirkes,* 39 Cal.2d 719, 729 [249 P.2d 1]:

" 'It is impossible to determine from the evidence which of the conflicting instructions formed the basis of the verdict reached by the jury. Under such circumstances, inconsistent instructions may constitute reversible error.' "

The error in the instructions as to specific intent was also prejudicial insofar as Dr. Bernhardt was concerned. In the absence of evidence sustaining a determination that there were conspirators other than Dr. Lund or Dr. Dunham, it was necessary to find that either Dr. Lund or Dr. Dunham, or both, had conspired with Dr. Bernhardt before he could be found guilty of the crime of conspiracy. ▇ At least two assenting persons are necessary for the existence of an unlawful agreement. (*People* v. *James,* 189 Cal.App.2d 14, 15 [10 Cal.Rptr. 809, 91 A.L.R.2d 697]; 1 Witkin, Cal. Crimes, § 109, p. 105.)

▇ The effect of the confusion in the instructions with respect to the nature of the intent required for a criminal

---

[5]In the case now before the court the jury was instructed in part as follows: "... you are not to single out any certain sentence, or any individual point or instruction, and ignore the others, but you are to consider all the instructions as a whole, and are to regard each in the light of all the others."

conspiracy was carried over into the field of the second charge, that of manslaughter. This is true because the court instructed the jury both with respect to the joint responsibility of conspirators[6] and with respect to the liability of one who aids and abets another in the commission of a crime. This was, of course, proper. (*People* v. *King*, 30 Cal.App.2d 185, 203 [85 P.2d 928].)[7] The difficulty is, however, that the jury may have applied the theory of conspiracy with respect to the liability of Dr. Lund and Dr. Dunham, premised upon a misconception of the law as to the requirement of specific intent. This is particularly evident with respect to the case of Dr. Lund. There was substantial evidence that he departed from the Stojakovich home about a half hour after the birth. Yet one of the theories relied upon by the prosecution to sustain a conviction of manslaughter was that the defendants failed to care properly for Mrs. Stojakovich when the seriousness of her condition became evident.[8]

---

[6]One of the instructions given was as follows: ''Where a criminal conspiracy has been formed, each of the persons forming the same, while he is a member thereof, is liable for every act, and is bound by the acts and declarations of each and all the conspirators, done or made in pursuance and furtherance of the said conspiracy, and continues to be so liable and bound for so long as he remains a member thereof.

''In contemplation of law, during the time when persons are coconspirators, the act of one in pursuance of the common design is the act of all, and each is legally responsible for any act of a confederate that follows incidentally in the execution of the common design as one of its probable and natural consequences, even though it was not intended as a part of the original plan, and even though he was not present at the time of the commission of such act.''

[7]In the *King* case, the court stated (30 Cal.App.2d at p. 203): ''Complaint is made that the prosecution proceeded upon a dual theory of guilt, viz., that the appellants were guilty as aiders and abettors and were likewise guilty as coconspirators, and that the court committed error in instructing the jury accordingly. Under the charge in the indictment it is immaterial whether the defendants were proved guilty by showing that they were aiders and abettors or coconspirators. The prosecution was not limited to either theory, but was entitled to make proof of guilt by any evidence competent to establish the crime charged, and was likewise entitled to an instruction permitting the jury to determine the ultimate fact of guilt without limitation to any specific theory or aspect of the case. (*People* v. *Burke*, 18 Cal.App. 72 [122 P. 435].) It was proper for the court to instruct the jury on as many theories as were logically deducible from the evidence, and it was for the jury to say from all the circumstances connected with the commission of the act whether the defendants were to be held guilty or not guilty as principals in the crime. [Citations.]''

[8]Part of the opening argument to the jury of the deputy district attorney was as follows: ''I ask you not to let them do that because not

██ With respect to the failure to give a proper instruction as to the element of proximate causation, it has been noted that it was the testimony of Dr. Bernhardt that in his opinion death was due to an embolism. It has also been noted that in a case of the nature of that now before this court, the alleged criminal act must be the legally responsible cause of the death. (See 1 Witkin, Cal. Crimes, § 78, p. 79.) With respect to the charge of manslaughter it was necessary to determine whether there was an act or omission on the part of the defendants, or any of them, which proximately caused the death. That the defendants were entitled to an instruction defining the element of causation, even if they requested none, has already been discussed. ██ With respect to the state of the evidence in support of the theory of the defendants, the governing principle is set forth in *People* v. *Miller*, 57 Cal.2d 821, at page 829 [22 Cal.Rptr. 465, 372 P.2d 297]: "In *People* v. *Carmen*, 36 Cal.2d 768, at page 773 [228 P.2d 281], it is said: '... a defendant is entitled to instructions on his theory of the case as disclosed by the evidence, no matter how weak. ██ As so ably stated in *People* v. *Burns*, 88 Cal.App.2d 867, 871 [200 P.2d 134], with ample citation of authority: "It is *elementary* that the court should instruct

---

only did they conspire to do these unlawful acts, and do them, but in regard to the second count of this indictment they—I will say this without malice—did an unlawful act in an unlawful manner without due caution or circumspection, and that caused this woman's death, and nothing else. ... Well, they treated her just fine. They had all the time in the world. She was bleeding. The scientific evidence shows you that. I don't care what they say. It is there, and she was bleeding to death, and they let her bleed, you know, for at least an hour and 13 minutes, or thereabouts, and they let her bleed more while oxygen was being administered to her. He tried to suture up that area but he couldn't. So finally he called in the ambulance or had the ambulance called in after a passage of time when it was just too late. Now, what does due caution and circumspection mean. It means the doing of an act by an individual that a reasonable and prudent person would not do under the same set of circumstances with disregard for the life of another person, and apparently nobody gave two hoots for Mrs. Stojakovich. Nobody. Because if they did, she would be here today. She would be living."

In his closing argument to the jury, the deputy district attorney said in part: "Counsel has told you that, well, Dr. Dunham and Dr. Lund really weren't doing all the bad things, it was Dr. Bernhardt in regard to the manslaughter. In effect, that is what he has told you. *They are all involved in the conspiracy.* They all knew what they were doing; they are not children. As far as the manslaughter is concerned, yes, Dr. Bernhardt was the man in charge. I am only going to say that everybody else there could have done something to save her, not their own necks." (Italics added.)

the jury upon every material question upon which there *is any evidence deserving of any consideration whatever.* [Citing cases.] *The fact that the evidence may not be of a character to inspire belief does not authorize the refusal of an instruction based thereon.* [Citing cases.] *That is a question within the exclusive province of the jury. However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true.* [Citing cases.]" ' "

 The test to be applied in determining the existence of prejudicial error has been stated by the Supreme Court as follows: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People* v. *Watson*, 46 Cal.2d 818, 836 [299 P.2d 243].) Under such test, the errors committed with respect to the instructions to the jury require a reversal of the judgment of conviction with respect to each defendant.

The appeal of each defendant from the order denying his or her motion for a new trial is dismissed. With respect to each defendant, the judgment of conviction is reversed as to each count.

Shinn, P. J., and Files, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 7, 1964.