Filed 5/7/26  P. v. Gatison CA4/2
*See concurring opinion*

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E081775 |
| v. | (Super.Ct.No. BAF2100903) |
| JOHNNIE JOSEPH GATISON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Stephen J. Gallon, Judge. Affirmed.

Mark D. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Maxine Hart, Deputy Attorneys General, for Plaintiff and Respondent.

1

Several people were in an alley in the early morning hours, where voices were raised. At some point, one of the persons in the alley, wearing a white shirt and a hat (later identified as Defendant Johnnie Joseph Gatison), pulled out a firearm, and another person, wearing a red hoodie, tried to wrest the gun from Defendant's hands. A third person, victim Keiwaun Porter, intervened, attempting to break up the scuffle over the gun, but the gun discharged, striking Porter in the left thigh, piercing his femoral artery, and causing his death from blood loss. Despite conflicting statements about which of the two people involved in the scuffle over the gun was wearing a white shirt and a hat, as opposed to a red hoodie, Defendant was determined to be the person who had pulled out the gun and he was arrested for, among other charges, murder (Pen. Code, § 187, subd. (a)),[1] and possession of a firearm by an ex-felon. (§ 29800, subd. (a)(1).) Following a jury trial, Defendant was convicted of those two counts and appealed.

On appeal, Defendant argues that the trial court erred (with asserted constitutional implications) by (1) not reading certain bracketed language in the CALCRIM No. 520 jury instruction regarding "the act" and "causation," which Defendant claims lessened the People's burden of proof; (2) responding to a jury question requesting a definition of "the act" by not reading the bracketed portion of CALCRIM No. 520, thereby allowing jurors to convict on a legally invalid theory; (3) failing to instruct the jury on self-defense and imperfect self-defense per CALCRIM Nos. 505 and 571; (4) failing to instruct on

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

accident, per CALCRIM Nos. 510 and 511; and (5) the record does not establish beyond a reasonable doubt that the prosecution proved his conduct satisfied the higher standard for implied malice murder set out in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*).  We affirm.

## BACKGROUND

a.      *The August 20, 2021, Incident*[2]

On August 20, 2021, Charnesha Jenkins drove to a location on Greystone Lane in Hemet, California, to visit a friend.  Jenkins stayed in her car and soon several people who were partying outside surrounded the car, which Jenkins had recently purchased.  While seated in her vehicle, someone fired a shot at her, so Jenkins called 911.

When police arrived she described the man who had shot at her and told them he had run into a particular apartment and had not come out.  The police subsequently searched the apartment and found Defendant hiding in the attic.  Jenkins went to an in-field lineup and identified Defendant.  Recordings of Jenkins's 911 call, her statements to police on the date of the incident, and her identification of Defendant were played for the jury.

At trial, Jenkins denied that a gun was pointed at her or any shots were fired and denied that Defendant was present or that she identified him, claiming that she was under the influence of alcohol and Xanax.  However, police officers who had contact with

---

[2] We provide a shortened version of this offense because although Defendant was acquitted of the counts pertaining hereto, the jury was permitted to consider the incident as evidence of prior bad acts, pursuant to Evidence Code section 1101, subdivision (b).

3

Jenkins on the date of the offense indicated she did not appear to be under the influence of intoxicants.

b.     *The September 16, 2021, Incident*

i.   *Prosecution Evidence*

Alondra Hernandez lived in a second story apartment off of North Elk Street in Hemet and her dining room window faced an alley behind the apartment, where people frequently hung out and partied.  On September 16, 2020, between 4:00 a.m. and 5:00 a.m., Hernandez heard arguing outside through an open window.

Hernandez looked out the window and saw two black men "shuffling" or "tussling."  One wore a white shirt, shorts, and a dark blue hat, the other wore a red hoodie.  The man with the white shirt had a handgun in his hand.  The man in the red hoodie had his hands on both of the other man's hands, and it appeared that the man in the red hoodie was trying to take something away from the man in the baseball cap.  The man in the red hoodie pushed the man in the white shirt against a gray truck that was parked in the alley.

Hernandez realized they were struggling over a gun that the man in the white shirt was holding.  The person in the white shirt was leaning up against a car, the person in the red hoodie was facing him, when a third person got between them to try to stop the men from fighting.  As the third person, Porter, pulled the two men apart, the gun went off.  Hernandez did not see who was holding the gun when it was fired.  In Hernandez's opinion, the shooting appeared to be accidental.

After the gun went off, Porter started hopping around on his right foot and screaming that he had been shot. The first two men continued struggling over the gun for about 10 more seconds and then both ran away in the same direction, while everybody in the alley scattered. Hernandez was shown a photo lineup and identified a photograph of Defendant as the person in the red hoodie except the skin tone was a little lighter.[3]

When law enforcement arrived on the scene they found Porter lying on the ground with a gunshot wound to his leg. Porter was taken to the hospital where he died. An autopsy showed that Porter died from blood loss resulting from damage to his left femoral artery, which was caused by a wound from a gunshot fired at close range.

Keshell Jones, who was on parole and wore a GPS ankle monitor, was present in the alley, sitting in her car, at the time of the shooting and was interviewed by law enforcement later that day. She recalled several individuals "tussling" around near her car, and she yelled at them to get away from her car. One of the people near Jones's car was a man wearing a hat, who owned a gold Mercedes Benz. As she yelled at the men in the group to get away from her car, another man came to help out. Then she heard a gunshot and heard Porter yelling that he had been shot. Porter asked Jones to take him to the hospital, but she refused because she was on parole.

---

[3] Hernandez expressed concern for her safety and asked to remain anonymous. When she saw Defendant at the preliminary hearing, Hernandez told the prosecutor that Defendant was not the man in the white shirt and blue baseball hat. At trial, she maintained that she did not recognize Defendant as either the man in the white shirt and hat or the man in the red hoodie, and she did not recognize Defendant as one of the people she had seen in the photo lineup.

Jones said the person in the hat was known as "Face," and she identified a photograph of Defendant as the person she knew as "Face."

Defendant was arrested in Los Angeles on September 16, 2020, during a traffic stop. At the time of his arrest, he was seated in the front passenger seat of a vehicle. On the floorboard between his legs was a loaded nine-millimeter semiautomatic handgun. The gun was swabbed for DNA and compared with DNA samples taken from Defendant and from Porter. Analysis done by the Department of Justice crime lab determined that Defendant and Porter were likely two of the three contributors of DNA on the gun.

Defendant was interviewed by police the day he was apprehended, and denied shooting Porter, claiming they were friends, and that Defendant had no reason to kill Porter. Defendant admitted that he called a woman a "bitch" and told her to leave. Then a man unknown to Defendant came up next to Defendant and said something in the woman's defense. Then Defendant noticed the man had a gun drawn. Defendant grabbed the man's arm as he and other people, including Porter, tried to wrestle the gun away. As Porter tried to grab the gun from the unidentified gunman, it fired.

Defendant and the other man continued struggling over the gun for several seconds, until the other man said "oh, shit, oh, shit, oh, shit." Defendant told the other man who had drawn the gun to let it go and assured the man he would not shoot him, and the other man let go of the gun. Defendant did not gain control of the gun until after the shooting, and when he did gain control, he kept the gun.

On October 31, 2020, Defendant called his brother and the call was recorded. In the call to his brother, Defendant said that the "Texas Rangers" hat that was found on the

6

gray truck—which police suspected fell off the baseball-cap-wearing gunman during the scuffle—could not have fallen off Defendant's head because he was "wearing a hat still" after the shooting.

Defendant admitted that he had a previous felony conviction.

ii. *Defense Evidence*

Defendant testified in his own defense that he was in the alley with Porter, indicating that he and Porter hung out with the same circle of people. There was an argument with other females, so Defendant left and returned later with another woman. After Defendant pulled up with the other woman, there was more hostility between the females, and the woman who arrived with Defendant was attacked by the first woman, possibly one of Defendant's prior girlfriends, requiring Defendant to break up that fight. Defendant told one of the women to leave and called her a name. Defendant walked the female he had brought with him, who had been attacked, back to his car, when he saw Jones arguing with the attacking girl. Defendant started walking backwards when another car pulled up with another woman who became involved in the argument, so Defendant told the other woman to just leave.

At this point, Defendant heard someone behind him say something aggressive, although Defendant was unsure what had been said because he had been drinking, but he spun around to see a male holding a firearm. There was a "tussle" over the gun, and Porter tried to intervene. The gun jerked forward, and Defendant heard the gunshot. The male who had been holding the gun started shuffling back toward one end of the alley,

but Defendant told him to "just let it go" because the police were coming. The male with the gun "let it go," handing the gun to Defendant, and the male walked away.

Defendant gave the gun to one of the men who was near Defendant after the gun had gone off, so Defendant could go check on Porter. The female, who was the person who had tried to help Defendant, moved his car. Defendant went to sit in someone else's car while they waited for an update on Porter's condition. Then, after learning that Porter had died, someone suggested going to Watts, and Defendant agreed. In Watts, Defendant received calls from people suggesting that he go north, but Defendant did not know what to do.

At this point, the person to whom Defendant had handed the gun arrived at Watts. When Defendant asked about the whereabouts of the gun, this still unnamed person stated that "he put it up in the house." Defendant told him to get the gun because he was going to return to Hemet to figure things out. Defendant was on his way back to Riverside when he was pulled over by police and arrested.

Defendant testified that the case involving Jenkins was made up and that he had no clue who she was. He denied shooting at Jenkins and stated he went into the apartment where he was found because he knew the boyfriend of the woman who lived there. He was just hiding in the attic because there were people outside involved in an altercation. The first time he spoke to Jenkins was after a court date when he asked her about the statements she had made. After mentioning that there was bodycam video of her statements, Jenkins told Defendant she never called 911. Defendant had Jenkins's phone

8

number and started calling her, and Jenkins apologized to Defendant for making up the story.

On cross-examination, Defendant admitted he had been convicted of first degree burglary in 2002, possession of cocaine for sale in 2005, while in 2008, 2012, and 2018, he was convicted of five felonies involving moral turpitude. Defendant further testified that he was wearing a red hoodie at the crime scene and was not wearing a hat, although when he was arrested he had a black ball cap. He got the baseball cap from the back seat of the car of the woman with whom he spent most of his time, when she drove to Los Angeles to see Defendant. When Defendant was arrested the officers had him take off the red sweatshirt he had been wearing while they patted him down, so he did not have it on when he arrived at the police station.

c. *Legal Proceedings*

Defendant was charged by way of an information with assault with a firearm (§ 245, subd. (b), count 1), possession of a firearm by an ex-felon (§ 29800, subd. (a)(1), count 2 [relating to the incident occurring on Aug. 20, 2020]), possession of a firearm by a prohibited person (§ 30305, subd. (a), count 3), murder (§ 187, subd. (a), count 4), and another possession of a firearm by an ex-felon (§ 29800, subd. (a)(1), count 5 [relating to the incident occurring on Sept. 16, 2020]).

It was further alleged that in the commission of count 1, Defendant personally used a Smith and Wesson nine-millimeter semi-automatic firearm (§ 12022.5, subd. (a)) and with respect to count 4, it was further alleged that Defendant intentionally discharged a firearm causing death or great bodily injury. (§ 12022.53, subd. (d).) Respecting

9

count 5, it was alleged that Defendant committed the offense while Defendant was released on bail. (§ 12022.1.)

In addition, the information alleged Defendant had previously been convicted of two serious felonies (nickel priors), within the meaning of section 667, subdivision (a), and two prior convictions for serious or violent felonies under the "Three Strikes" law. (§§ 667, subd. (e)(2)(A)-(i), 1170.12, subd. (c)(2)(A).)

Defendant was tried by a jury, which acquitted him of counts 1 through 3, but found him guilty of counts 4 and 5, in violation of section 187, subdivision (a), and section 29800, subdivision (a)(1). The jury made true findings on the enhancements for personal discharge of the firearm as to count 4, and for being personally armed with a firearm as to count 5.

In a bifurcated court trial, the court found that Defendant had suffered two nickel priors, and two strike priors, and denied Defendant's motion to strike the Three Strikes allegation. (Referring to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.)

Defendant was sentenced to an indeterminate term of 45 years to life for count 4 (15 years to life, tripled), and a term of 25 years to life for count 5, which the court ordered stayed pursuant to section 654. The court also stayed the terms for each of the "nickel priors." On July 20, 2023, Defendant timely appealed.

**DISCUSSION**

I.  *Defendant's Due Process Rights Were Not Violated by Instructional Error*

Defendant raises multiple claims of instructional error and claims the instructions violated his due process rights because they did not require the People to prove each element beyond a reasonable doubt.  We disagree.

We review claims of instructional error de novo.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; *People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

A.  *General Principles Governing Instructions*

"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence.  [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case."  (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.)

"'That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.  [Citations.]  The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.'"  (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155 (*Breverman*), disapproved on a different point in *People v.*

*Schuller* (2023) 15 Cal.5th 237, 260, fn.7, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 715–716 (*Sedeno*), fns. omitted.)

"'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1112.) "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'"" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248, citing *People v. Burgener* (1986) 41 Cal.3d 505, 538.) "'"The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole.'"" (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 (*Castillo*).)

"A trial court has a sua sponte obligation to instruct the jury on any uncharged offense that is lesser than, and included in, a greater charged offense, but only if there is substantial evidence supporting a jury determination that the defendant was in fact guilty only of the lesser offense. [Citations.] An uncharged offense is included in a greater charged offense if *either* (1) the greater offense, as defined by statute, cannot be committed without also committing the lesser (the elements test), or (2) the language of the accusatory pleading encompasses all the elements of the lesser offense (the accusatory pleading test)." (*People v. Parson* (2008) 44 Cal.4th 332, 348–349.)

Additionally, "[i]t is well settled that a defendant has a right to have the trial court, on its own initiative, give a jury instruction on any affirmative defense for which the record contains substantial evidence [citation]—evidence sufficient for a reasonable jury to find in favor of the defendant [citation]—unless the defense is inconsistent with the

12

defendant's theory of the case [citation]. In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.'" (*People v. Salas* (2006) 37 Cal.4th 967, 982–983 (*Salas*).)

"In contrast to lesser included offenses, a trial court's duty to instruct, sua sponte, or on its own initiative, on particular defenses is more limited, arising 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'" (*People v. Barton* (1995) 12 Cal.4th 186, 195; *Sedeno*, *supra*, 10 Cal.3d at p. 716.)

B. *Specific Claims of Instructional Error*

1. *Adequacy of the Instruction, CALCRIM No. 520, Defining the "Act" Necessary to Establish Causation for Implied Malice Murder*

Defendant argues that the court erred in instructing the jury on the principles relating to the definition of the act required for implied malice murder by failing to read the bracketed portion of CALCRIM No. 520 (defining murder and explaining express and implied malice).[4] We disagree.

---

[4] In a separate argument, which we address in Section II, below, Defendant also argues that the court's response to the jury's question regarding the "act" constituted reversible error because it allowed the jury to convict under a legally invalid theory.

13

"'[T]he correctness of jury instructions is determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" (*Castillo, supra*, 16 Cal.4th at p. 1016.) "'[T]he fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.'" (*People v. Rhodes* (1971) 21 Cal.App.3d 10, 20–21.) Even where an essential element is missing from one instruction, it may be supplied by another or cured in light of the instructions as a whole. (*People v Wright* (1985) 39 Cal.3d 576, 589, citing *People v. Galloway* (1979) 100 Cal.App.3d 551, 567–568.)

In determining whether an instruction is ambiguous or misleading, the court considers "the specific language challenged, the instructions as a whole and the jury's findings," as well as counsel's closing arguments to determine whether the instructional error "would have misled a reasonable jury." (*People v. Cain* (1995) 10 Cal.4th 1, 36, 37.) Reversal is not required unless it is reasonably likely the jury misunderstood and misapplied the court's instructions to the defendant's detriment. (*People v. Smithey* (1999) 20 Cal.4th 936, 963–964.)

The court instructed the jury on the elements of murder, reading CALCRIM No. 520, which stated: "The defendant is charged in Count 4 with murder in violation of [section 187]. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied

14

malice.  Proof of either is sufficient to establish the state of mind required for murder.
[¶] The defendant had *express malice* if he unlawfully intended to kill.  [¶] The defendant
had *implied malice* if:  [¶] 1. He intentionally committed the act; [¶] 2. The natural and
probable consequences of the act were dangerous to human life; [¶] 3. At the time he
acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted
with conscious disregard for human life.  [¶] Malice aforethought does not require hatred
or ill will toward the victim.  It is a mental state that must be formed before the act that
causes death is committed.  It does not require deliberation or the passage of any
particular period of time.  [¶] If you find the defendant guilty of murder, it is murder of
the second degree."

As the People point out, Defendant did not object to this instruction as written.
Nor did Defendant request or proffer an instruction to clarify the term about which he
now complains.  As we will demonstrate, the instruction given was correct and required
no further clarification absent an affirmative request.

"'Second degree murder is the unlawful killing of a human being with malice
aforethought but without the additional elements, such as willfulness, premeditation, and
deliberation, that would support a conviction of first degree murder.'" (*People v. Elmore*
(2014) 59 Cal.4th 121, 133, citing *People v. Knoller* (2007) 41 Cal.4th 139, 151
(*Knoller*).)  Malice, for the purpose of defining murder, may be express or implied.
(§ 188.)  It is express "'when there is manifested a deliberate intention unlawfully to take
away the life of a fellow creature.' [Citations.]  Implied malice is present 'when no
considerable provocation appears, or when the circumstances attending the killing show

15

an abandoned and malignant heart.'" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102–103 (*Nieto Benitez*).)

"Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'" (*Reyes*, *supra*, 14 Cal.5th at p. 988; see § 188.)

Implied malice therefore has two components: an objective component describing the act the defendant must commit, and a subjective component describing the mental state with which he must act. (See *Knoller*, *supra*, 41 Cal.4th at pp. 153, 157.) The objective component requires the performance of ""'an act, the natural consequences of which are dangerous to life"'" not merely in some vague or speculative sense, but which involves a high degree of probability that it will result in death. (*Reyes*, *supra*, 14 Cal.5th at pp. 988–989.)

Conversely, the subjective component merely "requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less." (*Knoller*, *supra*, 41 Cal.4th at p. 143.) In other words, "[t]he *subjective* component … is whether the defendant acted with 'a base, antisocial motive and with wanton disregard for human life.'" (*Id*. at p. 157.) Unlike the objective component, the subjective element does not "require a defendant's awareness that his or her conduct has a *high probability* of causing death." (*Ibid*.)

16

Defendant focuses his argument on the court's failure to read the bracketed portion of the instruction to the jury, although he does not cite any apposite authority requiring a trial court to include the bracketed language of CALCRIM No. 520 in cases where causation is not at issue. "When causation is an issue, the court is required to instruct the jury on the subject." (*People v. Bell* (2020) 48 Cal.App.5th 1, 17, citing *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 591 (*Bernhardt*).) In other words, the language of the bracketed portion is part of a larger, optional instruction on proximate cause, which, according to the Bench Notes to CALCRIM No. 520, the court must give sua sponte if *causation* is at issue.

The optional, bracketed portion[5] of the instruction states:

"[(An act/ [or] (A/a) failure to act) causes death if the death is the direct, natural, and probable consequence of the (act/ [or] failure to act) and the death would not have happened without the (act/ [or] failure to act). A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence]." (CALCRIM No. 520.)

This portion of CALCRIM No. 520 is not required to be given sua sponte, contrary to Defendant's assertion. To demonstrate the error of Defendant's assumption regarding the significance of the bracketed portion, a review of another bracketed portion, also found among the optional provisions of CALCRIM No. 520, states: "[There may be

[5] The bracketed portions of CALCRIM No. 520 are separated but not enumerated.

17

more than one cause of death. (An act/ [or] (A/a) failure to act) causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death].” (CALCRIM No. 520.) This bracketed portion also pertains to proximate causation and does not define the word “act.”

Defendant is mistaken in assuming the court had a duty to define the act that was needed to establish implied malice. Even a failure to act, where the defendant has a legal duty to do so, may be actionable as implied malice murder. (See *People v. Collins* (2025) 17 Cal.5th 293, 308, approving of the general principle stated in *People v. Rolon* (2008) 160 Cal.App.4th 1206, 1213, [that a parent ‘“has a legal duty to his or her minor child to take every step reasonably necessary under the circumstances in a given situation to exercise reasonable care for the child, to protect the child from harm, and to obtain reasonable medical attention for the child]”’.) It therefore makes sense that the patterned jury instructions would avoid defining a particular act as the cause of the death, leaving that finding for the jury to make.

In any event, the court instructed the jury on the need to find the Defendant had committed a “prohibited act” in joint operation with criminal intent, by reading CALCRIM No. 252, and it instructed the jury that the crimes charged, which included involuntary manslaughter as a lesser included offense, based on the act of brandishing a firearm, constituted a prohibited act. Thus, in addition to the People’s argument that Defendant was the person who brandished the firearm, the jury was instructed that the People alleged Defendant committed the crime of brandishing a firearm as a prohibited

act.  Because the instructions must be read together as a whole, there is no room to claim the jury was not instructed on the nature of the "act."

Defendant relies on *Bernhardt*, *supra*, 222 Cal.App.2d 567, where the reviewing court addressed the failure to instruct on proximate causation respecting a charge of manslaughter, as authority for his position that the jury must be instructed with the bracketed portion of CALCRIM No. 520.  However, the Bench Notes following the instruction confirm that the bracketed section is intended to clarify the issue of proximate cause, and not to serve as a definition of what act satisfies the objective aspect of implied malice.  In *Bernhardt*, where causation was at issue, the defendant was a chiropractor charged with manslaughter in the death of a woman after she gave birth.  The chiropractor had received the patient as a referral from another chiropractor where the victim had desired a natural birth, a treatment that fell within the chiropractor's licensure. (*Id.*, at pp. 570–571, 592.)

In the *Bernhardt* case, there were divergent opinions as to the cause of death, from death caused by shock "due to post partum hemorrhage, due to multiple lacerations of the vagina," to the defendant's position that the cause of death was an embolism for which no act of any defendant was responsible.  (*Bernhardt*, *supra*, 222 Cal.App.2d at p. 590.)  The reviewing court held that the principles of proximate causation were not properly explained to the jury.  (*Id.*, at p. 591.)  This authority does not support Defendant's position in the present case that the bracketed portion was required to be given sua sponte to define the "act," where but one cause of death was alleged:  the discharge of the firearm which severed Porter's femoral artery, causing Porter to bleed out.

19

We agree with the premise that the "failure to instruct upon the element of proximate causation *where that matter is in issue* constitutes error." (*Bernhardt*, *supra*, 222 Cal.App.2d at p. 591, italics added, citing *People v. Kerrick* (1927) 86 Cal.App. 542, 548.) In *Bernhardt*, in addition to the diverse medical opinions as to the cause of death, there was a question of whether Dr. Bernhardt was guilty of conspiracy to unlawfully engage in the practice of medicine where he held licensure as a chiropractor rather than as a medical doctor, as well as a question regarding whether the instructions on specific intent may have caused confusion for the jury, which had been instructed on criminal negligence, also. (*Bernhardt*, at pp. 587–588 [where the defense theory was that natural childbirth, for which the chiropractic license is adequate and for which the referral of the patient to defendant's practice had been made, was a defense to the charge of conspiring to engage in the unlawful practice of medicine].)

Having been charged with involuntary manslaughter, the jury could have convicted Dr. Bernhardt based on the theory that he committed a lawful act with criminal negligence or based on the theory he committed the unlawful act of practicing medicine without a license. The reviewing court therefore held that error in failing to instruct the jury to determine which act or omission on the part of the defendants proximately caused the death was reversible error. (*Bernhardt*, *supra*, 222 Cal.App.2d at p. 595.) The holding in *Bernhardt* does not suggest, much less require, that the bracketed portion of CALCRIM No. 520 must be given, sua sponte, in all implied malice murder cases.

In the present case, the jury was properly instructed that Defendant must be found to have committed an act which caused the death. The bracketed portion of CALCRIM

20

No. 520 does not define the term "act" instead, it explains proximate causation. Thus, even if the court had given the bracketed portion, it would not have resolved Defendant's claim regarding the "prohibited act."

Aside from the *Bernhardt* case, Defendant has cited no relevant authority holding that the bracketed portion of CALCRIM No. 520 must be given sua sponte. The court was not required to instruct the jury on what act constituted the act that caused the death; that was a matter within the exclusive province of the jury to decide. As for proximate causation, the issue which the bracketed portion is intended to explain, there was only one cause of death established by the evidence in this case, the gunshot wound resulting from the discharge of the weapon during the struggle, so there was no need for the bracketed portion of CALCRIM No. 520. The question for the jury to decide was whether the gun discharged due to Defendant's act, with knowledge that his conduct endangered the life of another.

Insofar as the instructions, read together, adequately explained that Defendant's act was that of brandishing the firearm, failure to read the bracketed portion of CALCRIM No. 520 was not error, nor did it violate Defendant's due process rights.

2. *Whether the Trial Court Erred by Failing to Instruct the Jury on Self-Defense per CALCRIM No. 505, Sua Sponte*

Defendant argues the trial court erred in failing to instruct the jury on principles relating to self-defense, sua sponte, pursuant to CALCRIM No. 505. We disagree.

A sua sponte duty to instruct on self-defense arises "only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of

21

such a defense and the defense is not inconsistent with the defendant's theory of the case." (*Sedeno*, *supra*, 10 Cal.3d at p. 716.) Thus, when the trial court believes "there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory." (*Id.*, at p. 717, fn. 7; *Breverman*, *supra*, 19 Cal.4th at p. 157.)

Here there was no evidence of self-defense, given Defendant's assertion that the gun went off accidentally as he tried to wrest the gun from the second person. In other words, his defense was that he did not volitionally shoot Porter to defend himself or another. Self-defense, therefore, was a theory inconsistent with the defense of accidental discharge, so the trial court was under no sua sponte obligation to instruct the jury on the defense. (*Sedeno*, *supra*, 10 Cal.3d at p. 717.) And because Defendant did not request that the court instruct the jury on self-defense, he forfeited the right to have the jury instructed on this theory.

Even if the Defendant had requested the instruction on self-defense, the failure to give it was not prejudicial error because there was not sufficient evidence to support the theory of self-defense. To find Defendant guilty of implied malice murder, the jury likely concluded that the Defendant was the person who brandished the firearm under the instructions given, which means the jury resolved the factual issues unfavorably to an interpretation that Defendant was acting in self-defense.

The court was under no duty to instruct on self-defense sua sponte.

3. *Whether the Trial Court Committed Reversible Error by Failing to Instruct the Jury on the Defense of Accident, per CALCRIM No. 510*

Defendant contends that although he did not request it, and there is no sua sponte duty on the court's part to give the instruction, the trial court erred prejudicially by not instructing the jurors with CALCRIM No. 510 regarding excusable homicide caused by accident. We disagree.

CALCRIM No. 510 provides, in relevant part, that a defendant is not guilty of murder if he killed someone "by accident and misfortune or while doing a lawful act in a lawful way," "with *usual and ordinary caution*," and "without the necessary mental state for (murder/ [or] manslaughter)." The prosecution has the burden of proving that the killing was not excused.

As relevant to this particular assignment of error, the instruction is based on section 195, which provides, in the first part, that homicide is excusable in the following cases: "(1) When committed by accident and misfortune, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." This language echoes that found in section 26, which defines the classes of persons not capable of committing a crime, including "[p]ersons who committed the act or made the omission charged through misfortune or by accident, when it appears that there was no evil design, intention, or culpable negligence." (§ 26; see *People v. Anderson* (2011) 51 Cal.4th 989, 996 (*Anderson*).)

In *Anderson*, the Supreme Court explained, "That the law recognizes a defense of accident does not, however, establish that trial courts have a duty to instruct on accident

sua sponte." "That duty extends to '"instructions on the defendant's theory of the case, including instructions 'as to defenses "'that the defendant is relying on …, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.'"'"" [Citation.] But '"when a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a 'pinpoint' instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such 'pinpoint' instructions are not required to be given *sua sponte* and must be given only upon request."'"" (*Anderson*, *supra*, 51 Cal.4th at pp. 996–997, citing *People v. Saille* (1991) 54 Cal.3d 1103, 1117.)

The Supreme Court explained in *People v. Jennings* (2010) 50 Cal.4th 616, 674–675 (*Jennings*), that "Generally, the claim that a homicide was committed through misfortune or by accident 'amounts to a claim that the defendant acted without forming the mental state necessary to make his or her actions a crime.' [Citation.] *In People v. Saille*, *supra*, 54 Cal.3d 1103, we held that evidence 'proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt' may, but only upon request, justify the giving of a pinpoint instruction that 'does not involve a "general principle of law" as that term is used in the cases that have imposed a sua sponte duty of instruction on the trial court.' (*Id*. at p. 1120.) 'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required

to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' (*Id.* at p. 1119.)"

Thus, regarding instructions on the defense of accident, "a sua sponte instructional duty arises 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and* the defense is not inconsistent with the defendant's theory of the case.'" (*Breverman*, *supra*, 19 Cal.4th at p. 157.) In fact, a trial court's responsibility to instruct on accident "extends no further than the obligation to provide, *upon request*, a pinpoint instruction relating the evidence to the mental element required for the charged crime." (*Anderson*, *supra*, 51 Cal.4th at p. 997; see *People v. Gutierrez* (2009) 45 Cal.4th 789, 824.)

Here, the Defendant's argument relies on a mischaracterization of the exchange between the court and the parties, which Defendant incorrectly summarizes as "the trial court and the prosecutor both expressly stated on the record that they believed the shooting of Porter was an accident." Instead, both the People and the court acknowledged Defendant's claim that the gun discharged accidentally while he "tussled" with another over the gun. It was this preceding "tussle" that rendered an instruction on "accident" inappropriate, along with the fact the jury necessarily concluded that Defendant was brandishing the weapon before it accidentally discharged.

Accident as a complete justification for the homicide—as covered by CALCRIM No. 510—was never raised or acknowledged by the court and parties. Evidence of the struggle over the gun contradicts any theory that the death occurred purely by misfortune. Moreover, given the jury's verdict that indicates it found Defendant was the person who

brandished the gun, initiating the circumstances that gave rise to the struggle over the weapon and ultimate accidental discharge of the weapon, the instruction is not supported by the evidence.

The People at all times advanced the theory that Defendant was engaged in the unlawful brandishing of the firearm, which was committed in reckless disregard for human life, when the gun was accidentally discharged during the struggle; the trial court acknowledged that theory in stating, "People allege—so the People are alleging factually that [Defendant] pulled out a gun and then there was a struggle and it went off." Still later, the court noted, "And so they are going to argue that that conduct gets you over the implied malice." At no time did the court or the People agree that the shooting was an accident as defined in CALCRIM No. 510.

In fact, during closing arguments, the People argued, "Now, for the [D]efendant to be convicted of murder, it must be shown beyond a reasonable doubt two specific things and then additionally a sub[-]element. Now, the two elements that we must look at are first that the [D]efendant committed an act that caused the death of another person. That death was bringing the firearm—or excuse me, that act was bringing the firearm out."

Because Defendant was not engaged in a lawful act when the gun discharged, he could not assert the affirmative defense of accident. (§ 26.) Nevertheless, the court did instruct the jury on the lesser offenses of involuntary manslaughter based on the misdemeanor offense of brandishing a firearm. "Although a jury may determine, under the circumstances of a particular case, that a defendant's brandishing of a firearm did not pose a sufficient danger to human life to establish that the defendant acted with malice, in

26

other circumstances the act of brandishing a firearm may be sufficiently dangerous to human life to support a finding of malice." (*Nieto Benitez*, *supra*, 4 Cal. 4th at p. 96.)

Even if the Defendant had requested an instruction on the defense and the court had refused to instruct the jury on the defense, the error would have been harmless. As we have already explained at length, the jury necessarily concluded Defendant was the person who brandished the firearm, so the defense of accident did not apply insofar as the factual issue of whether Defendant acted lawfully was resolved against him. And if the jury had found that he did not brandish the gun, then he could not be convicted, regardless of accident or any other defenses. So any error in failing to include the defense was harmless. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The Defendant did not request the pinpoint instruction on accident as a justification for the homicide, and, as a pinpoint instruction, the court was under no obligation to give the instruction absent a request, or absent substantial evidence to support the theory.

4. *Whether the Trial Court Committed Error by Failing to Instruct the Jury on Imperfect Self-Defense per CALCRIM No. 571*

Defendant claims the trial court committed error by failing to instruct the jury on imperfect self-defense, as explained in CALCRIM No. 571. The People argue there was no substantial evidence that Defendant intentionally fired the gun in self-defense, required to warrant the giving of such an instruction. We agree with the People, noting, in addition, that the theory of either self-defense or imperfect self-defense was inconsistent with Defendant's theory of the case. Additionally, as defensive matters not

supported by the evidence, the burden was on Defendant to request such an instruction, which Defendant failed to do.

A court is not required, sua sponte, to instruct on a defense that is inconsistent with the defendant's theory of the case. (*Salas*, *supra*, 37 Cal.4th at p. 982, citing *Breverman*, *supra*, 19 Cal.4th at p. 157.) In the present case, the Defendant's theory of the case was that he wrestled with the unknown person who had pointed a gun at Defendant to defend himself, and that the gun discharged accidentally and that, anyway, he was intoxicated. However, voluntary intoxication is inadmissible to establish that a defendant acted without implied malice. (*People v. Soto* (2018) 4 Cal.5th 968, 975.)

"[W]hen a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury, the doctrine of 'imperfect self-defense' applies to reduce the killing from murder to voluntary manslaughter." (*People v. Cruz* (2008) 44 Cal.4th 636, 664.) "Generally, the intent to unlawfully kill constitutes malice. [Citations.] 'But a defendant who intentionally and unlawfully kills lacks malice … in limited, explicitly defined circumstances: either when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by *negating the element of malice* that *otherwise inheres* in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder." (*Breverman*, *supra*, 19 Cal.4th at pp. 153–154, overruled

28

on a different point in *Schuller*, *supra*, 15 Cal.5th at p. 260, fn. 7.) Thus, when there is substantial evidence of imperfect self-defense in a murder case, the trial court's failure to instruct on that theory precludes the jury from making a factual finding that is necessary to prove the malice element of murder. (*Schuller*, at p. 260.)

Here, the Defendant's theory was that he struggled over the gun with an unidentified second person and that the gun accidentally discharged when Porter attempted to intercede. There was no evidence the Defendant "killed" Porter in "unreasonable self-defense"—the unreasonable but good faith belief in having to *act* in self-defense, as against Porter. To support such a theory in the present case, Porter would have had to have been an aggressor, which theory is not supported by any evidence whatsoever.

Because the Defendant did not request the instruction, and because there is no evidence from which the trial court could infer the Defendant was relying upon this defense, nor evidence to support the notion that the Defendant actively shot Porter in the unreasonable belief he needed to defend himself, there was no error in failing to instruct on this theory sua sponte. (See *People v. Bell* (2020) 48 Cal.App.5th 1, 20.)

5. *Whether the Trial Court Erred by Failing to Instruct on Accident in Heat of Passion, per CALCRIM No. 511*

Defendant asserts the trial court erred by failing to instruct the jurors with CALCRIM No. 511 regarding excusable homicide resulting from accident in the heat of passion. We disagree.

29

CALCRIM No. 511 provides: "The defendant is not guilty of (murder/ [or] manslaughter) if (he/she) killed someone by accident while acting in the heat of passion. Such a killing is excused, and therefore not unlawful, if, at the time of the killing: [¶] 1. The defendant acted in the heat of passion; [¶] 2. The defendant was (suddenly provoked by *<insert name of decedent>*/ [or] suddenly drawn into combat by *<insert name of decedent>*); [¶] 3. The defendant did not take undue advantage of *<insert name of decedent>*; [¶] 4. The defendant did not use a dangerous weapon; [¶] 5. The defendant did not kill *<insert name of decedent>* in a cruel or unusual way; [¶] 6. The defendant did not intend to kill *<insert name of decedent>* and did not act with conscious disregard of the danger to human life; [¶] AND [¶] 7. The defendant did not act with criminal negligence. [¶] A person acts *in the heat of passion* when he or she is provoked into doing a rash act under the influence of intense emotion that obscures his or her reasoning or judgment. The provocation must be sufficient to have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment. [¶] Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection. [¶] In order for the killing to be excused on this basis, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up (his/her) own standard of conduct. You must decide

30

whether the defendant was provoked and whether the provocation was sufficient.  In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than judgment.  [¶] [A *dangerous weapon* is any object, instrument, or weapon [that is inherently deadly or dangerous or one] that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.]  [¶] [An object is *inherently deadly* if it is deadly or dangerous in the ordinary use for which it was designed.]  [¶] [*Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than moderate harm.]  [¶] *Criminal negligence* involves more than ordinary carelessness, inattention, or mistake in judgment.  A person acts with *criminal negligence* when:  [¶] 1. He or she acts in a way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk.  [¶] In other words, a person acts with criminal negligence when the way he or she acts is so different from how an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act.  [¶] The People have the burden of proving beyond a reasonable doubt that the killing was not excused.  If the People have not met this burden, you must find the defendant not guilty of (murder/ [or] manslaughter)."

CALCRIM No. 511 is derived from the second paragraph of section 195, governing excusable homicide.  We have already addressed the applicability of the accident theory set forth in section 195, subdivision (1), as expressed in CALCRIM

31

No. 510.  Section 195, subdivision (2), refers to a homicide "[w]hen committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation, or upon a sudden combat, when no undue advantage is taken, nor any dangerous weapon used, and when the killing is not done in a cruel or unusual manner."

"The trial court has no duty to instruct on a defense that is not supported by substantial evidence." (*People v. Bohana* (2000) 84 Cal.App.4th 360, 370.)  There was no evidence of provocation by Porter resulting in the heat of passion, and no evidence of sudden combat between Porter and Defendant.  Further, because the jury must have concluded that Defendant had brandished the weapon to find him guilty of second degree murder, there is no basis on which to conclude the shooting was excusable, even if the jury believed the gun discharged by accident.

Absent a request for the instruction by Defendant, the court was under no duty to instruct the jury on the theory of a killing committed by accident and misfortune in the heat of passion.

6. *Absent Instructional Error, Defendant Has Not Demonstrated Prejudice*

Defendant's final point is that the multifarious alleged instructional errors prejudiced him, requiring reversal.  However, we have determined there were no instructional errors committed by the trial court, so it follows that reversal is not required.

II. *Whether the Trial Court Committed Instructional Error in Responding to the Jury's Question*

During jury deliberations, the jury sent a question to the court asking, "'Implied malice, colon, define quote, unquote, act.  Is it the act of committing the murder or the act

32

of possessing the weapon that committed the murder?  Please provide example if possible."'  The court discussed the question with both parties and decided that because the jury "has to make a determination as to what the act is and whether or not that act fits the definitions under the implied malice portion of 520," the best course was to re-read the instruction which defined the "act."

Although Defendant maintained that possessing the firearm could not be the act that formed the basis for implied malice because the firearm was found in his possession after the fact, in Los Angeles, the court concluded that the jury would have to determine if the weapon possession occurred in the alleyway if they considered it to be the act, but that it was for the jury to decide what the act would be.  Ultimately, the court responded to the jury question by stating "The jury must determine what act if any was done by the [D]efendant.  The jury must determine if that act meets the requirements of implied malice murder as listed in CALCRIM instruction 520."  Defendant made no request that the bracketed language of CALCRIM No. 520 be given.

On appeal, Defendant argues that the court's response constituted reversible error because it allowed the jury to convict under a legally invalid theory, again referring to the bracketed portion of CALCRIM No. 520.  We disagree.

"The court has a primary duty to help the jury understand the legal principles it is asked to apply."  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 (*Beardslee*), citing *People v. Thompkins* (1987) 195 Cal.App.3d 244, 250–251.)  "This does not mean the court must always elaborate on the standard instructions."  (*Beardslee*, *supra*, at p. 97.)

33

During jury deliberations "when the jury 'desire[s] to be informed on any point of law arising in the case … the information required must be given.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 97, quoting § 1138.) "However, '[w]here the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.'" (*Brooks*, *supra*, at p. 97.)

Although the court need not always elaborate on standard instructions, it has "a 'mandatory' duty to clear up any instructional confusion expressed by the jury." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.) "This means that a trial court's response to a jury question can be erroneous even if it does not technically misstate the law." (*People v. Fleming* (2018) 27 Cal.App.5th 754, 766.) In other words, "a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide … whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Beardslee*, *supra*, 53 Cal.3d at p. 97.)

An appellate court applies the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury, or to give further instructions in response to a jury's inquiry. (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746; *People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4.)

Here, the court was required to defer to the jury on the question of what the dangerous or prohibited act must be. After all, the jury is the trier of fact, and "where the

trial is by jury: [¶] (a) All questions of fact are to be decided by the jury. [¶] (b) Subject to the control of the court, the jury is to determine the effect and value of the evidence addressed to it, including the credibility of witnesses and hearsay declarants." (Evid. Code, § 312.) For this reason, "The court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them and of the credibility of the witnesses. Either party may present to the court any written charge on the law, but not with respect to matters of fact, and request that it be given." (§ 1127.) For the court to instruct the jury that a particular act constituted the dangerous or prohibited act required for implied malice would be to invade the province of the jury.

Applying these principles to this case, we note, as the People point out, that possession of the firearm was not the only act the jury could or did find, and the court did not instruct the jury that possession of the firearm could form the basis for the objective act needed to establish implied malice. That was for the jury to determine.

Additionally, the court had separately instructed the jury that the act of brandishing the firearm was the conduct alleged by the People as the specific act underlying the involuntary manslaughter instructions, CALCRIM Nos. 580 and 983. As the court noted, the People intended to argue "that that conduct [brandishing the firearm] gets you over the implied malice." The act of brandishing a firearm has been held to constitute a proper basis for implied malice murder. (*People v. Thomas* (2012) 53 Cal.4th 771, 814–815; *Nieto Benitez*, *supra*, 4 Cal.4th at pp. 109–110; *People v. Tophia* (1959) 167 Cal.App.2d 39, 46 (*Tophia*).)

35

Defendant has not established that CALCRIM No. 520 constituted a misstatement of the law, or that the trial court was required to read the bracketed language sua sponte. On appeal, "whether the trial court erred in instructing the jury is determined by examining ""the entire record, including the instructions and arguments"" to see if ""the jury was misled to the prejudice of the defendant.""" (*People v. Spencer* (2018) 5 Cal.5th 642, 690.)

Nevertheless, Defendant argues that the question from the jury should have led the court to instruct the jury on the bracketed section of CALCRIM No. 520, which, as we have discussed, does not define "act," but, instead, explains how the jury should determine whether the act was the proximate cause of death. Defendant did not and does not argue that his act of "tussling" or "struggling" over the firearm was not the proximate cause of Porter's death, so there is no basis to require the court to read the bracketed portion.

Defendant did not request that the court read the bracketed portion, which is an optional provision. (*People v. Nieves* (2021) 11 Cal.5th 404, 436, citing *People v. Guerra* (2006) 37 Cal.4th 1067, 1134.) "'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Hin* (2025) 17 Cal.5th 401, 483.)

Because the court has broad discretion in responding to jury questions, we review with deference. The jury was correctly instructed on the elements of implied malice murder and was also instructed to "Pay careful attention to all of these instructions and

36

consider them together." Absent a specific request for further, other, pinpoint, or clarifying instructions, there was no error in the trial court's response to the jury's question.

III. *Sufficiency of Evidence of Second Degree Implied Malice Murder*

In supplemental briefing, Defendant argues there is insufficient evidence to support the conviction for implied malice murder to meet what Defendant describes as a higher standard established in *Reyes*, *supra*, 14 Cal.5th 981.[6] We disagree.

We begin with the governing standard of review: "When reviewing a challenge to the sufficiency of the evidence, we ask '"whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."' (*People v. Edwards* (2013) 57 Cal.4th 658, 715, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for '"substantial evidence—that is, evidence which is reasonable, credible, and of solid value"' that would support a finding beyond a reasonable doubt. (*People v. Boyce* (2014) 59 Cal.4th 672, 691.) These same standards apply to challenges to the evidence underlying a true finding on a special circumstance. (*Edwards*, at p. 715.)" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

---

[6] Defendant also argues that the holding of *Reyes*, *supra*, 14 Cal.5th 981 is retroactive, because, as a rule, judicial decisions apply retroactively, citing *People v. Guerra* (1984) 37 Cal.3d 385, 399. That case discussed the retroactivity of a California Supreme Court decision, although it spoke generally in terms of "judicial decisions." But because *Reyes* did not address the correctness of CALCRIM No. 520 or alter the definition of implied malice, we do not need to reach this point.

"Homicide, the killing of one human being by another, is not always criminal. In certain circumstances, a killing may be excusable or justifiable. [Citations.] Murder and manslaughter are the forms of criminal homicide. 'Murder is the unlawful killing of a human being … with malice aforethought.' (§ 187, subd. (a).) Malice aforethought may be express or implied. (§ 188.)" (*People v. Elmore* (2014) 59 Cal.4th 121, 132.) Section 188 provides in relevant part: "(a) For purposes of Section 187, malice may be express or implied. [¶] (1) Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature. [¶] (2) Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a).) Stated another way, malice is express when a defendant intends to kill and implied when a defendant consciously disregards danger to human life. (*Knoller*, *supra*, 41 Cal.4th at pp. 151, 156–157.)

The language of section 188, subdivision (a)(2), has been described as lacking clarity in its reference to an "abandoned and malignant heart." (*Knoller*, *supra*, 41 Cal.4th at p. 151.) "Two lines of decisions developed, reflecting judicial attempts to 'translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply.' [Citations.] One strand held that malice could be implied where 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' [Citations.] The alternate strand held that malice could be implied where the killing was proximately caused by '"an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers

38

the life of another and who acts with conscious disregard for life.""'" (*Nieto Benitez*, *supra*, 4 Cal.4th at pp. 103–104.)

Nevertheless, under both lines of decisions, implied malice requires a defendant's awareness of the risk of death to another. (*Knoller*, *supra*, 41 Cal.4th at p. 152.) Indeed, in *People v. Watson* (1981) 30 Cal.3d 290, 300, the California Supreme Court held that the two definitions of implied malice in essence articulated the same standard. (See *Knoller*, at p. 152.) *Reyes* did not disapprove of these precedents.

"Implied malice requires proof of both a physical act and a mental state. Physically, a defendant must perform an act whose natural consequences are dangerous to life, or put another way, defendant must perform '"an act that involves a high degree of probability"' of death." (*In re Ferrell* (2023) 14 Cal.5th 593, 600 (*Ferrell*), citing *Knoller*, *supra*, 41 Cal.4th at p. 156, and *Nieto Benitez*, *supra*, 4 Cal.4th at p. 111.)

Implied malice may be proven by circumstantial evidence and has both a physical and mental component. (*Ferrell*, *supra*, 14 Cal.5th at p. 604.) "The mental component is established where the defendant knows that his conduct endangers the life of another and acts with conscious disregard for life." (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1425.)

As for the dangerous act, it is settled that brandishing a loaded firearm at a person is an act dangerous to human life. (*Nieto Benitez*, *supra*, 4 Cal.4th at pp. 109–110; *Tophia*, *supra*, 167 Cal.App.2d at p. 46.) As explained in *People v. Thomas*, *supra*, 53 Cal.4th at pages 814–815, "An unintentional shooting resulting from the brandishing of a

weapon can be murder if the jury concludes that the act was dangerous to human life and the defendant acted in conscious disregard of life."

Defendant argues that the holding of *Reyes*, a case in which the Supreme Court reviewed the denial of a resentencing petition pursuant to section 1172.6, established a higher standard for finding implied malice. We disagree. The subject of review in *Reyes* was a trial court's denial of a resentencing petition under section 1172.6, based on its "finding that Reyes was guilty beyond a reasonable doubt of second degree murder" (*Reyes*, *supra*, 14 Cal.5th at p. 987), without mentioning direct aiding and abetting. The reviewing court in *Reyes* reconsidered this finding, "'guided by the principles that are in [CALCRIM No. 520], specifically implied malice.'" (*Ibid*.)

But the Supreme Court noted that the lower court had found that the defendant, *along with several other gang members*, one of whom was armed, traveled to rival gang territory, that "the natural and probable consequence of their doing so was dangerous to human life, that Reyes was aware the act was dangerous to human life, and that he deliberately acted with conscious disregard for that danger." (*Reyes*, *supra*, 15 Cal.5th at p. 987.) In other words, the defendant had been found guilty under the natural and probable consequences doctrine. The Supreme Court did not deviate from prior decisions defining implied malice, ruling instead that the trial court had incorrectly concluded Reyes was liable for murder as a direct perpetrator who harbored implied malice without any evidence to support that conclusion. (*Id*. at pp. 987, 988–989.) The Supreme Court went on to conclude that Reyes's conviction could not be sustained on a direct perpetrator theory. (*Id*., at p. 988.)

40

Far from raising the bar for findings of implied malice, the Supreme Court instead reviewed with approval the decisional law interpreting implied malice second degree murder as applied to an aider and abettor, using the holding of *Knoller*, *supra*, 41 Cal.4th at page 152, to define implied malice, and explaining that the defendant's act must be the proximate cause of death, citing *Jennings*, *supra*, 50 Cal.4th at page 643. The Supreme Court concluded there was no substantial evidence to support the trial court's denial of Reyes's resentencing petition based on his liability for second degree murder on a direct perpetrator theory. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) It did not apply a higher standard of implied malice.

At the time of Defendant's trial, former CALCRIM No. 520 instructed the jury, when determining the physical component of implied malice, to decide whether the "natural and probable consequences of the defendant's act were dangerous to human life." (Former CALCRIM No. 520.) Defendant claims the Supreme Court through its decision in *Reyes*, has now set higher standard for implied malice murder in that it now requires "*a high degree of probability that it will result in death*." We disagree. The Supreme Court reaffirmed what it had held in earlier cases, reversing only because there was no evidence that *Reyes* was a direct aider and abettor acting with malice.

Nowhere in *Reyes* did the Supreme Court declare that the "high probability of death" standard and the "'dangerous to human life'" standard were no longer equivalent. Instead it acknowledged that "dangerous to life" still "means the same thing as "'a high degree of probability that'" the act in question "'will result in death.'"" (*Reyes*, *supra*, 14 Cal.5th at p. 989.) Nor did the Supreme Court require trial courts to instruct juries using

41

the high probability of death standard, or criticize CALCRIM No. 520, or hold that the bracketed portions must be read to the jury sua sponte, or hold that the instruction permitted a conviction under an invalid legal theory. "An opinion is not authority for a point not raised, considered, or resolved therein." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 57.)

To the contrary, the Supreme Court applied the meaning of implied malice established by earlier caselaw. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) The instructions given in this case properly explained implied malice. Under the instructions, as read together, the jury necessarily concluded that Defendant was the person who brandished the firearm and that his act of brandishing a loaded firearm was an act dangerous to human life. (*Nieto Benitez*, *supra*, 4 Cal.4th at pp. 109–110.) There was nothing faulty in the jury's determination, given that even an unintentional shooting resulting from brandishing a loaded firearm can be murder if the jury concludes the act was dangerous to human life and the defendant acted in conscious disregard of life. (*People v. Thomas*, *supra*, 53 Cal.4th at pp. 814–815.)

In his supplemental brief, Defendant reiterates the argument in his opening brief that the implied malice instructions were inadequate and relieved the prosecution of proving beyond a reasonable doubt that Defendant's conduct "'involved a high degree of probability that it will result in death,'" relying on *Reyes*, *supra*, 14 Cal.5th at page 989. We disagree.

As discussed previously, the instructions given to the jury in this case informed it that to be guilty of implied malice murder, it must find that the natural and probable

42

consequences of his act were "dangerous to human life" and that at the time he acted, "he knew his act was dangerous to human life."  The *Reyes* decision recognized that "dangerous to life" still means the same thing as a high degree of probability that the act will result in death.  (*Reyes*, *supra*, 14 Cal.5th at p. 989.)  There was no error in the instructions given, notwithstanding the fact the patterned instruction has now been improved.

Finally, Defendant argues in his supplemental brief "[t]he record does not establish beyond a reasonable doubt that the failure to correctly instruct the jury on implied malice was harmless" (some capitalization and boldface omitted) error.  We do not need to reach this point because even after the *Reyes* decision, the instructions on implied malice given in this case were correct.  There was no error in instructing the jury using the former version of CALCRIM No. 520, and there is substantial evidence to support the second degree implied malice murder conviction.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____

P. J.

I concur:

FIELDS _____

        J.

[*People v. Gatison*, E081775]

MENETREZ, J., Concurring.

I agree with affirmance, but I write separately because my reasoning differs in some respects from the majority opinion's.

Because causation was not at issue, the trial court did not err by failing to give the bracketed instruction on causation in CALCRIM No. 520. For the same reason, the failure to give the instruction was not prejudicial. All parties agreed that the accidental gunshot caused the victim's death. The pivotal disputed issue was whether defendant was the person who brandished the gun before it accidentally fired.

When the jury asked about the definition of "act," the court did not abuse its discretion by referring the jury to the instructions already given. Also, it is not reasonably probable that the jury convicted (or was considering convicting) defendant on the basis of his act of mere possession of the gun. The prosecutor argued that brandishing was the act that led to the victim's death; the prosecutor never argued that mere possession was the relevant act.

The court did not err by failing to instruct the jury on self-defense or imperfect self-defense. The record contains no evidence that defendant brandished the gun in self-defense or imperfect self-defense, i.e., in the actual but perhaps unreasonable belief that brandishing the gun was necessary to defend himself against the imminent danger of death or great bodily injury. (CALCRIM Nos. 505, 571.) And the prosecutor never argued that if defendant was not the person who brandished the gun, then he could

1

nonetheless be guilty.  Also, the record contains no evidence that anyone fired the gun intentionally, so defendant's argument based on an intentional discharge is meritless.

The trial court did not err by failing to instruct on the defense of accident, because the instruction is required only upon request but was not requested.  (*People v. Anderson* (2011) 51 Cal.4th 989, 996-998.)  All parties agree that the gun went off by accident, but it does not follow that the defense of accident—which requires that the defendant act lawfully (CALCRIM No. 510)—applies or even could apply.  In addition, the failure to give the instruction cannot have prejudiced defendant.  If defendant brandished the gun, then he did not act lawfully.  And if he did not brandish the gun, then he was innocent independently of the defense of accident.

The trial court did not err by failing to instruct the jury on accident in the heat of passion.  The instruction is inapplicable because it requires that the defendant not use a dangerous weapon.  (CALCRIM No. 511.)  And if defendant did not brandish the gun, then he was innocent independently of accident in the heat of passion.

Finally, defendant argues that *People v. Reyes* (2023) 14 Cal.5th 981 "clarified the mental state required for implied malice murder" and applies retroactively, so this case must be retried and the new jury instructed on that clarification.  The argument fails because *Reyes* did not clarify the mental state for implied malice murder.  It merely applied the same language that has existed in the case law for decades, as explained in the supplemental respondent's brief.

For all of these reasons, I concur in the judgment.


MENETREZ
J.